**In the Matter of the EXTRADITION OF Carlos Enrique GARCIA, Jesus Zamora–Salas.**

Civ. Nos. 93–2689–M, 93–2690–M.

United States District Court, S.D. California.

Sept. 19, 1994.

Michael Littman, Law Offices of Michael Littman, San Diego, CA, for defendant Carlos Enrique Garcia aka El Tarzan.

David J. Cohen, Cohen, Hubachek and Riggs, San Diego, CA, for defendant Jesus Miguel Zamora–Salas aka El Cougar aka Chuy.

Alan D. Bersin, U.S. Atty., John P. Pierce, Alberto Arevalo, Asst. U.S. Attys., U.S. Dept. of Justice, San Diego, CA, for Republic of Mexico through the U.S. Government.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND CERTIFICATION OF EXTRADITABILITY

PAPAS, United States Magistrate Judge.

In the proceeding before this court, the Republic of Mexico (hereafter Mexico), through the United States government, seeks the extradition of two United States citizens, Carlos Enrique Garcia, and Jesus Zamora–Salas, alleged to have committed crimes in Mexico. The court, for reasons explained below, grants the petition, finding the detainees extraditable.

The interests of Mexico were represented by the United States through the United States Department of Justice, by United States Attorney Alan D. Bersin and Assistant United States Attorneys John P. Pierce and Alberto Arevalo. Carlos Enrique Garcia was represented by retained counsel Michael Littman. Jesus Zamora–Salas was represented by retained counsel David Cohen of Cohen, Hubacheck & Riggs.

*BACKGROUND*

Carlos Enrique Garcia (hereafter "Garcia" or "El Tarzan")[1] and Jesus Zamora–Salas (hereafter "Zamora" or "El Cougar")[2] are

---

1. As is described in more detail below, both detainees were identified or described at various times and by different persons with nicknames. Mr. Garcia was referred to as "El Tarzan" and Mr. Zamora–Salas was referred to as either "El Cougar" or "Chuy".

2. When referred to or described together, the terms "respondents" or "detainees" will also be used.

accused by Mexico of having been involved with or committing various crimes in violation of Mexican laws. Pursuant to an extradition treaty between Mexico and the United States, Treaty 31 UST 5059, TIAS 9656, and under federal laws supplementing and implementing such treaties, 18 U.S.C. § 3184, *et seq.*, the United States issued a provisional arrest warrant for the respondents, signed by Magistrate Judge Louisa Porter on July 15, 1993. The warrant resulted in the arrest of respondents Garcia on July 20, 1993 and Zamora on July 16, 1993. On February 22, 1994, respondents moved the court to terminate the provisional arrest warrant. The court granted respondents' motion and permitted Mexico to go forward with extradition proceedings under the Treaty.

The United States filed documents in support of the extradition requests at various times, the first of which was on September 23, 1993.[3] Between that date and the evidentiary hearings on the extradition requests, there were numerous other filings by the United States and by counsel for the detainees as well as several status hearings. Respondents made a substantial number of motions,[4] decisions on which were all, except for one,[5] deferred, by consent among the parties, until this order on the evidentiary hearings.

Most of the motions by respondents were evidentiary in nature. Each is addressed below in the discussion of the required proof.

Respondents also requested delays of the start and conclusion of the evidentiary hearing dates in order to adequately investigate and present their responses to the petitions for extradition. As a result, the formal evidentiary hearings took place on April 5, 1994, April 6, 1994, April 28, 1994, May 9, 1994 and May 19, 1994. The hearings concluded with receipt of written final arguments of each party by the court on June 3, 1994.

## DISCUSSION

### Description of alleged offenses and involvement of respondents.

The Republic of Mexico seeks to extradite respondents to answer to charges of homicide, attempted homicide, conspiracy, possession of firearms reserved for the military, storing of firearms reserved for the military, and, damage to the country's transportation and communication infrastructure (see Exhibit I).[6] Those offenses are alleged to be violations of Mexican laws, in particular, Article 83, Parts I, II and III, of the Federal Law on Firearms and Explosives; Articles 164 and 399 of the Federal Penal Code; and, Article 533 of the Law on Highways, Waterways, Railroads and Other Transportation Infrastructure for the Federation of Mexico.[7] (Extradition I: 431–442.)

The factual allegations are that the respondents participated in the planning and com-

---

**3.** Unless otherwise specified, the filings were as to both respondents.

**4.** Except as otherwise indicated, respondents jointly submitted their motions or each specifically joined in all of the motions made by the other detainee.

**5.** That one motion related to the dismissal of the provisional arrest warrant, the results of which are described above.

**6.** The exhibits proffered by the United States on behalf of the Republic of Mexico at the evidentiary hearing were received in the same format as originally filed in the office of the Clerk of the United States District Court for the Southern District of California. The United States also offered exhibits at the hearing that were not previously filed. The United States' exhibits filed before the evidentiary hearing are identified by Roman numerals e.g., I, II, and those filed at the evidentiary hearing are indicated by Arabic numbers. All respondent exhibits are identified by

capital letters. The United States, on behalf of Mexico filed an original extradition package and two supplemental extradition packages against the respondents. "Extradition I" stands for the package of materials which Mexico filed on September 23, 1993, in support of its extradition request. "Extradition II" stands for the supplemental documents which Mexico filed on December 6, 1993, in support of its extradition request. "Extradition III" stands for the second supplemental documents which Mexico filed on December 21, 1993, in support of its extradition request.

**7.** In the earliest papers filed by the United States, charges for vandalism were referenced (see Government's Memorandum re The Law of Extradition, filed September 14, 1993, page 2. line 9). However, vandalism is not mentioned in any later filed documents and no reference to that charge was raised in any of the oral proceedings or hearings. The court has therefore not considered that charge as part of the extradition request.

pletion of the events that resulted in a May 24, 1993 shooting at the International Airport, Guadalajara, Jalisco, Mexico. According to the allegations of the Mexican authorities, the Arellano brothers, located in Tijuana, sent a group of men, described as a "hit squad", to Guadalajara to search for and ultimately murder rival drug lord, Joaquin Guzman Loera (also called "El Chapo"). Instead of finding and killing "El Chapo", the "hit squad" ended up in a shootout at the Guadalajara airport which resulted in the death of Roman Catholic Cardinal Posadas and at least six others.

It is uncontradicted that there was a shootout at the Guadalajara airport at which Cardinal Posadas and others were killed. Respondents contend, however, that they were not part of any group traveling to Guadalajara much less the "hit squad" alleged to have committed the shootings. They further contend that any evidence, in the form of statements linking them to the "hit squad", was elicited as a result of torture and any fruits of those statements should therefore be disregarded in their entirety as inherently unreliable. They also contend they were not identified or that the identification was flawed. They further argue that even if there is evidence of their involvement, there is neither sufficient probable cause to justify their extradition nor competent evidence of dual criminality.

*Nature of hearing and requisite elements for extradition*

■ An extradition hearing, under 18 U.S.C. § 3184 *et seq.*, is designed to determine whether the respondent should be surrendered to a foreign government. In order to extradite these respondents, the United States, on behalf of the Republic of Mexico, must establish that:

(1) the judicial officer is authorized to conduct extradition proceedings;

(2) the court has jurisdiction over the respondent;

(3) the applicable treaty is in full force and effect;

(4) the crimes for which surrender is sought are included within the terms of the treaty; and,

(5) there is probable cause that a crime or crimes were committed and that the respondents participated in or committed it. *Bingham v. Bradley*, 241 U.S. 511, 36 S.Ct. 634, 60 L.Ed. 1136 (1916). *McNamara v. Henkel*, 226 U.S. 520, 33 S.Ct. 146, 57 L.Ed. 330 (1913), *Zanazanian v. US*, 729 F.2d 624 (9th Cir.1980).

If the court determines that all the requisite elements have been met, the findings are incorporated into a certification of extraditability. The certificate is forwarded to the Department of State. The Secretary of State makes the ultimate decision on whether to surrender the respondents. 18 U.S.C. § 3184, *et seq.*

*Discussion of elements and evidence*

1. The judicial officer is authorized to conduct the extradition proceedings.

The authority of a Magistrate Judge to conduct the proceedings is provided by 18 U.S.C. § 3184, *Ward v. Rutherford*, 921 F.2d. 286, 289 (D.C.Cir.1990) and Rule 74 of the Local Rules of the United States District Court of the Southern District of California. This element was not challenged by the respondents.

2. The court has jurisdiction over the respondents.

■ The court has jurisdiction over the respondents if they are before the court. *In re Pazienza* 619 F.Supp. 611 (S.D.N.Y.1985). This issue was not challenged by the respondents.

3. The treaty is in full force and effect.

The law limits extradition to circumstances where the treaty is in full force and effect. 18 U.S.C. § 3184; *Argento v. Horn*, 241 F.2d. 258 (6th Cir.1957). Exhibit I, Appendix B was submitted by the United States in support of its position that the treaty is presently in full force and effect. The Department of States's opinion is entitled to deference. *Galanis v. Pallanck*, 568 F.2d 234 (2nd Cir.1977); *Sayne v. Shipley*, 418 F.2d 679 (5th Cir.1969) *cert. denied*, 398 U.S. 903, 90 S.Ct. 1688, 26 L.Ed.2d 61 (1970).

The validity of the treaty was challenged by respondents in a motion to deny extradition on two grounds.

First, respondents argue that, "[i]t is a tenet of international law that a treaty is invalid if there has been a fundamental change of circumstances."[8] (See Zamora's motion 3, filed December 7, 1993, page 6). Respondents alternatively assert that even if valid, the treaty is not being applied "in good faith" (See same motion, page 6). Rulings on both motions were deferred until these findings.

Respondents failed to adequately explain their position or point to any specific evidence which might support either theory. The court can only assume that the entirety of respondents argument is based on that portion of their presentation related to torture of the alleged co-conspirators of respondents (identified below in discussion of requirement 5) and the consequent unreliability of the statements obtained. Assuming the foregoing is the position to which respondents were referring in their arguments and motions, the assertion is dealt with in the discussion and analysis of requirement 5, below. If there is another basis, it fails for lack of proof.

4. The crimes for which surrender is sought are included within the terms of the treaty.

According to the United States' submission of December 23, 1993 and consistent therewith at the hearings, Mexico seeks extradition of the respondents for Mexican federal and state charges identified in the requesting papers.

Those offenses are:

Conspiracy, Bearing of Firearms Reserved for the Military, Storing Firearms Reserved for the Military, Damage to the Country's Transportation and Communication Infrastructure, Homicide and Attempted Homicide.

Respondents challenge the requirement of dual criminality by asserting, among other things, that the elements of the offense of Storing Firearms Reserved for the Military, one of the Mexican offenses, are absent, which is fatal to the extradition request as to that offense. *U.S. v. Khan,* 993 F.2d 1368, 1372–1373 (9th Cir.1993).

Additionally, respondents argue that if the court is satisfied that the elements of the other offenses are set out, then the court must analyze the specific elements of each individual offense to determine if there is analogous law in the United States for each offense. Then, if the foregoing is established, the court must apply the facts to each element to see if the facts satisfy the required elements of each offense. Respondents assert that if the foregoing analysis is adopted by the court, the court cannot order the extraditability of respondents because it cannot be determined what conduct, would be violative of the Mexican laws in question. (See Zamora final argument, part II, pp. 3–8).

The first position of the respondents is, in effect, that the charges fail to satisfy the doctrine of dual criminality. The second argument goes to the issue of probable cause to extradite and will be addressed in part (5) below.

The United States, not surprisingly, takes the opposite position and responds on several fronts. First, it argues that the Appendix to the Treaty specifies certain categories of offenses for which both the United States and Mexico have agreed extradition *shall* take place (see Article 2, paragraph 1). Included within that list is paragraph 19, which states,

19. Offenses against the laws relating to prohibited weapons, and the control of firearms, ammunition, explosives, incendiary devices or nuclear materials.

In effect, the argument is that deference should be given to the desires of the contracting parties and the Treaty between the agreeing countries should be liberally construed to achieve those ends. *Valentine v. United States ex rel Neidecker,* 299 U.S. 5, 57 S.Ct. 100, 81 L.Ed. 5 (1936).

---

**8.** Citing, *The International Law Process; Cases and Materials,* Daniel G. Partan, Carolina Academic Press, (1992); Articles of the Vienna Convention.

Secondly, the United States argues that the elements are not the focus of the analysis; instead, dual criminality is satisfied if the conduct is a crime in both jurisdictions. The United States cites a number of cases to the effect that the core of the examination is the act, not the crime charged. See Government's Supplemental Memorandum Re The Law of Extradition, filed February 22, 1994, pages 6–7.

■ The law of extradition requires that a fugitive be delivered up if the seeking country satisfies each extradition requirement, including that of "dual criminality", *U.S. v. Khan,* 993 F.2d 1368, 1372 (9th Cir.1993). Under the dual criminality doctrine, extradition is appropriate,

> "... only if the conduct complained of is considered criminal by the jurisprudence or under the laws of both the requesting and requested nations." *United States v. Van Cauwenberghe,* 827 F.2d 424, 428 (9th Cir.1987), cert. denied, 484 U.S. 1042, 108 S.Ct. 773, 98 L.Ed.2d 859 (1988) (Quoting from *Quinn v. Robinson,* 783 F.2d 776, 791–792 (9th Cir.), cert. denied, 479 U.S. 882, 107 S.Ct. 271, 93 L.Ed.2d 247 (1986).

Thus, if the offenses identified by Mexico in its extradition request are crimes in Mexico and in the United States, this requirement has been satisfied. *United States v. Levy,* 905 F.2d 326, 328 (10th Cir.1990).

The treaty between the United States and Mexico, 31 UST 5059, TIAS 9656, effective January 25, 1980, provides, under Article 2, Paragraphs 1 and 3, in part, that:

> "1. Extradition shall take place, ... for wilful acts which fall within any of the clauses of the Appendix and are punishable in accordance with the laws of both Contracting Parties by deprivation of liberty the maximum of which shall not be less than one year.
>
> .    .    .    .    .
>
> 3. Extradition shall also be granted for wilful acts which, although not being included in the Appendix, are punishable, in accordance with the federal laws of both Contracting Parties, by a deprivation of liberty the maximum of which shall not be less than one year."

■ The court has reviewed the arguments and law cited by the parties and the Mexican statutes in question. That review complete, the court believes the language of the Mexican statutes in question is sufficiently clear and explicit to include the elements for each of the offenses for which extradition is sought.

The offenses for which the respondents are being sought are identified by statute, including the punishment, in EXTRADITION I, as follows:

*FEDERAL OFFENSES*

Conspiracy, Article 164, page 433 and 440;

Bearing of Firearms Reserved for the Military, Article 83, page 434;

Storing Firearms Reserved for the Military, Article 83 BIS, page 435;

Damage to the Country's Transportation and Communication Infrastructure, Article 533, page 436;

*STATE OF JALISCO OFFENSES*

Homicide, Article 213, page 439; and,

Attempted Homicide, Article 52, page 439.

The court disagrees with the respondents that the elements of Storing Firearms Reserved for the Military are not set out in the Mexican statutes.

Throughout the proceedings, from the initial submission of extradition papers by the United States in September, 1993 to final written argument, both parties have referred to the Mexican "military weapons" charges with the prefatory words "possession" or "storing". Thus, the parties have assumed the correct beginning word for the "possession" of military weapons charges is, in fact, "possession" and that the correct beginning word for the "storing" of military weapons charges is, in fact, "storing". However, an examination of the statute itself does not reveal the use of either word in the language of the statute.

Article 83 (page 434 of EXTRADITION I) states in pertinent part:

> ARTICLE 83.—Any person who, without having been granted the corresponding permit, *bears* a weapon reserved for the

exclusive use of the Army, Navy, or Air Force, shall be punished by: ...

Article 83 BIS (page 435 of EXTRADITION I) states:

ARTICLE 83 BIS.—Any person who, without having granted the corresponding permit, should carry out a **gathering** of firearms, shall be punished by: ... (emphasis by court).

Nowhere in either paragraph does either "possession" or "storing" appear. The closest words, and what the court believes are the operative words, are "bears" (Article 83) and "gathering" (Article 83 BIS), emphasized above.

The Mexican authorities have clearly indicated a difference between the two articles and the court believes it is reasonable to interpret the word "gathering" in Article 83 BIS to include "storing" within its meaning [9]. Likewise, it is also reasonable to include within the meanings of the term "bears" the word "possession" [10]. Thus, the court adopts the meaning that "bears" is the equivalent of "possession" and that "gathering" is the same as "storing" as to each military weapons charge, respectively.

Respondents apparently believed and argued that Article 83 BIS was and is part of Article 83 and that there was/is no separate offense for "storing" military weapons. That position is belied by the capitalized paragraph immediately above Article 83 (page 434), where it states:

STIPULATIONS OF ARTICLES 83 AND 83 BIS OF THE FEDERAL LAW OF FIREARMS AND EXPLOSIVES IN FORCE AS OF MAY 24, 1993,

■ As to the remainder of respondents' arguments, they also fail. According to respondents' own authority, *U.S. v. Khan*, 993 F.2d 1368, 1372 (9th Cir.1993), the court stated,

"... [m]any cases have held that dual criminality is satisfied even though the names of the crimes and the required elements were different in the two countries.... in each of these cases the laws of the two countries were sufficiently analogous to satisfy dual criminality."

The court went on to use as examples seven different extradition cases where requirements/elements were not the same or were missing entirely or it was determined that broader interpretations of laws supported the dual criminality requirements. (*Id.* at 1372–1373). *Matter of the Extradition of Russell*, 789 F.2d 801 (9th Cir.1992), cited by respondents, also supports the foregoing.

The same is true here. Respondents have been accused by Mexico of Conspiracy in violation of Mexican law. Under United States law, a conspiracy is an agreement among two or more persons to commit a crime. 18 U.S.C. § 371. Conspiracy to commit a crime is an extraditable offense under Article 2(4)(a) of the Treaty.

The evidence presented indicates that respondents entered into a conspiracy to kill "El Chapo" Guzman in Guadalajara. Respondents' co-conspirators Bayardo (Extradition I: 130–132), Vascones (Extradition II: 7–9) and Torres (Extradition II: 16–18) have stated that respondents were among a group sent to Guadalajara to carry out a plan to kill "El Chapo" Guzman and his associates.

Respondents have been accused by Mexico of Possession of Firearms Reserved for the Military in violation of Mexican law. Under United States law, possession of certain types of weapons is illegal. See 18 U.S.C. § 922. Unlawful possession of certain weapons is an extraditable offense under Article 2(a) and (3) and Appendix part 19 of the Treaty.

The evidence presented indicates that respondents' co-conspirators Bayardo (Extradition I: 133–136), Vascones (Extradition II: 6–9) and Torres (Extradition II: 16–17) ad-

---

**9.** In fact, the word "gather" or "gathering" conjures up many synonyms which include the same thing as "storing"; for example, stockpile, collect, accumulate, heap up, pile, amass, cumulate, stash away, reserve, save, save up and batch, just to name a few. [See J.I. Rodale, "The Synonym Finder" (1978)].

**10.** As with gathering, "bears" has many synonyms such as, carry, tote, have, possess, contain, hold, put on, don and assume, as well as many others. [See J.I. Rodale, "The Synonym Finder" (1978)].

mitted that respondents were armed with AK–47's and other assault weapons, and stored them in houses being guarded in Tijuana and Guadalajara. In addition, there is ample evidence to indicate that numerous arms and weapons were recovered from the house. (Extradition I: 43–44, 116–117, 159–163, 443–452) that matched the descriptions given by the co-conspirators.

Respondents have been accused by Mexico of Storing Firearms Reserved for the Military in violation of Mexican law. Under United States law, possession of certain types of weapons is illegal. See 18 U.S.C. § 922. Unlawful storage of firearms is an extraditable offense under Article 2(1) and (3) and Appendix part 19 of the Treaty.

The evidence presented indicates that respondents' co-conspirators admitted that they stored assault weapons in the houses they were assigned to guard in Tijuana and Guadalajara. (Extradition I: 133–136; Extradition II: 6–9, 16–17). Additionally, numerous assault weapons were recovered from the houses in Tijuana and Guadalajara (Extradition I: 43–44, 116–117, 159–163, 443–452).

Respondents have been accused by Mexico of Damage to the Country's Transportation and Communication Infrastruction, in violation of Mexican law. Under United States law, damaging airports and aircrafts is illegal. See, for example 18 U.S.C. § 31, *et seq.* Damaging Mexico's transportation and communication infrastructure is an extraditable offense under Article 2(1) and (3) and Appendix parts 2 and 19 of the Treaty.

The evidence presented indicates that the gunfire exchange between respondents' gang and "El Chapo" Guzman's gang damaged property at the airport and caused flight delays at the airport. (Extradition I: 85–115, 118–120, 164–208, 340–358).

Respondents have been accused by Mexico of Homicide in violation of Mexican law. Under United States law, homicide is unlawful. California Penal Code §§ 187–199. Homicide is an extraditable offense under Article 2(1) and Appendix part 1 of the Treaty.

The evidence presented indicates that seven persons died and others were injured from the exchange of gunfire between respondents' gang and "El Chapo" Guzman's gang at the Guadalajara airport on May 24, 1993. (Extradition I: 82–84, 146–158, 164–306, 334–430). The respondents' co-conspirators have described the events leading up to the shoot out at the Guadalajara airport with distinct similarity. Bayardo (Extradition I: 130–132, 137), Vascones (Extradition II: 7–9) and Torres (Extradition II: 16–17) independently described that they and respondents travelled from Tijuana to Guadalajara with the intent to kill "El Chapo" Guzman and his associates. They describe possession and training with assault weapons to accomplish their goal. While each co-conspirator inculpates himself and respondents in the plan to kill "El Chapo" Guzman, they inexplicably exculpate themselves in the actual killings that took place at the Guadalajara airport. Nevertheless, the evidence presented is clear that respondents went to Guadalajara to kill "El Chapo" Guzman and that gunfire was exchanged at the airport, resulting in the deaths of seven persons. Consequently, the evidence against the respondents is probable, at the very least, that they were involved in the planning if not the actual exchange of gunfire at the Guadalajara airport resulting in the deaths of seven persons.

Respondents have been accused by Mexico of Attempted Homicide in violation of Mexican law. Under United States law, attempted homicide in unlawful. California Penal Code § 217, *et seq.* Attempted homicide is an extraditable offense under Article 2(4)(a) and Appendix parts 1 and 2 of the Treaty.

The evidence indicated above, in reference to the charges of homicide, demonstrates that respondents travelled to the Guadalajara airport with the intent to kill "El Chapo" Guzman and his associates. Although seven persons other than "El Chapo" were killed, there is probable cause to believe from the evidence that respondents were involved in the planning of the shootings, and attempted to kill "El Chapo" Guzman. The fact that other persons were killed and wounded is not material to the question.

The court therefore concludes that the each of the crimes for which extradition is requested by Mexico is among those speci-

fied in the Treaty or is analogous to a United States Federal law.

5. There is probable cause that a crime or crimes were committed and that the respondents participated in or committed the crimes.

■ Each of the Mexican offenses, above described, survives the respondents' challenge. A review of the evidence submitted in support of those charges meets the requirements regarding identity and probable cause sufficient to fulfill the fifth extradition requirement. That conclusion is based on the following analysis.

The Treaty between the United States and Mexico calls for probable cause to be measured by the standards established in the requesting country. Article 3 of the Treaty says, in part

> ARTICLE 3 *Evidence Required*
>
> Extradition shall be granted only if the evidence be found sufficient, according to the laws of the requested Party, either to justify the committal for trial of the person sought if the offense of which he has been accused had been committed in that place....

■ In this case, that means as defined in federal law. *Bozilov v. Seifert,* 967 F.2d 353, 356 (9th Cir.1992), *Oen Yin–Choy v. Robinson,* 858 F.2d 1400, 1407 (9th Cir.1988). The Magistrate Judge need only determine whether there is competent evidence to justify holding the respondent for trial, not whether the evidence is sufficient to justify conviction. *Collins v. Loisel,* 259 U.S. 309, 316, 42 S.Ct. 469, 472, 66 L.Ed. 956 (1922). The Magistrate's function is to determine whether there is "any" evidence establishing

reasonable or probable cause. *United States ex rel. Sakaguchi v. Kaulukukui,* 520 F.2d 726, 730–731 (9th Cir.1975).

■ An extradition hearing is not a criminal proceeding and the person whose return is sought is not entitled to the rights available in a criminal trial at common law. *Neely v. Henkel,* 180 U.S. 109, 21 S.Ct. 302, 45 L.Ed. 448 (1901); *Simmons v. Braun,* 627 F.2d 635 (2nd Cir.1980); *Charlton v. Kelly,* 229 U.S. 447, 461, 33 S.Ct. 945, 949, 57 L.Ed. 1274 (1931); *Glucksman v. Henkel,* 221 U.S. 508, 512, 31 S.Ct. 704, 705, 55 L.Ed. 830 (1911).

Respondents were identified in statements of Juan Carlos Mendoza Castillo (hereafter Mendoza or "Carlos Paisa"), Juan Enrique Vascones[11] Hernandez (hereafter Vascones or "El Puma"), Jesus Alberto Bayardo Robles (hereafter Bayardo or "El Gori") and Ramon Torres Mendez (hereafter Torres or "El Spooky") (see factual recitation below) as having participated in a scheme to assassinate a rival drug lord in Guadalajara, Mexico which instead resulted in the death of Cardinal Posadas and at least six others. The statements established the physical identity and participation of respondents. The recitation of events was reinforced on several occasions by most of the same persons either reiterating or adopting all or substantially all of their statements in the context of meetings with FBI agents[12] (in which pictures of the respondents were identified by Bayardo, Vascones, Torres and Mendoza)[13] or in appearances before state or federal judicial authorities in Mexico.

■ Evidence that conflicts with that submitted on behalf of the demanding party

---

**11.** Also, at times, spelled "Vazcones" and "Bascones".

**12.** The court ruled that the United States could introduce live testimony in the form of testimony of FBI Agents. The court also ruled that Mexico was not prohibited from supplementing the documentary evidence in support of its extradition requests. The court required, however, that Mexico comply with 18 U.S.C. § 3190, requiring verification of all (supplemental) documentary evidence submitted. Not only is the submission of documents in support of extradition authorized by federal law, (see 18 U.S.C. § 3190), the purpose served by allowing documents is to facil-

itate the process. There is, however, nothing to prohibit or prevent any requesting country from introducing evidence in the form of live testimony if desired. The purpose of allowing submittal of verified supplemental documentary evidence was to save Mexican residents from having to travel to the extradition hearing, to present the evidence in person, not to exclude live testimony, if desired. See *United States v. Taitz,* 134 F.R.D. 288 (S.D.Cal.1991).

**13.** Mendoza identified Zamora–Salas, "El Cougar", but did not identify respondent Garcia "El Tarzan", in the photos presented to him by the FBI.

is not permitted, nor is impeachment of the credibility of the demanding country's witnesses. *Collins v. Loisel,* 259 U.S. 309, 315–317, 42 S.Ct. 469, 471–472, 66 L.Ed. 956 (1922), *In re Locatelli,* 468 F.Supp. 568 (S.D.N.Y.1979). Also, extradition treaties do not contemplate the introduction of testimony of live witnesses by the respondent to contradict the demanding country's proof. *Bingham v. Bradley,* 241 U.S. 511, 517, 36 S.Ct. 634, 637, 60 L.Ed. 1136 (1916). Explanatory evidence is allowed only if the evidence would, clearly, negate a showing of probable cause. *Matter of Sindona,* 450 F.Supp. 672, 685 (S.D.N.Y.1978), aff'd. 619 F.2d 167 (2nd Cir.1980), citing *Collins, supra,* at 316, 42 S.Ct. at 472. Thus, it has been held appropriate to permit evidence that tends to obliterate probable cause but not evidence which merely contradicts the same. *In the Matter of the Extradition of Contreras,* 800 F.Supp. 1462 (S.D.Tex.1992); *Republic of France v. Moghadam,* 617 F.Supp. 777 (N.D.Cal.1985). The Magistrate Judge conducting the extradition proceeding has wide latitude in admitting evidence. *Extradition of Kraiselburd,* 786 F.2d 1395, 1399 (9th Cir. 1986). Hearsay evidence is admissible on behalf of the respondent to establish the "obliteration" of probable cause. *Taitz, supra,* at 289.

Here, unless respondents are able to entirely "explain", i.e., "obliterate" the inculpatory statements of Mendoza, Vascones, Bayardo and Torres, there exists probable cause to believe that the offenses described under the discussion of requirement 4, above, were committed and that the respondents are those identified as participants. As indicated at the outset, respondents failed in those efforts.

There is a plethora of evidence identifying and linking respondents to the offenses. The question was never whether there was enough evidence but whether the evidence was acceptable in light of respondents' arguments that the statements of Mendoza, Vascones, Bayardo and Torres (hereafter referred to as co-conspirators), were so tainted

because of torture that any probable cause established by the statements was "obliterated".

The question is resolved by the authorities cited by respondents themselves. In the *Contreras, supra,* and the *Moghadam, supra,* cases, the courts allowed testimony regarding the recantation of statements because, it was asserted, the recantation would "obliterate" probable cause and the proof of probable cause and thus the 5th requirement would fail.

Here, respondents were unable to proffer to the court that the statements of the co-conspirators were "recanted" in their entirety. Instead, the respondents requested the court allow testimony from persons who had personally discussed with the co-conspirators the nature and extent of the torture to establish that the statements were not voluntary. It was not until the testimony of Jose Cruz Ramirez Martinez (hereafter "Cruz") that it was learned that there is a process in both the federal and state courts of Mexico by which those persons who have given a statement are afforded the opportunity to adopt, reject or amend their statements. The process was described by Mr. Cruz as "amplification".

As the court understands the testimony of Mr. Cruz,[14] the person who gives the statement appears before the court and, as indicated above, is given the opportunity to adopt, reject (recant) the statement in its entirety, reject portions of the statement or modify the statement previously given. In this case, when questioned about their statements, the co-conspirators *reaffirmed* the statements in almost all respects except where the statements would implicate themselves in the actual shootings at the airport. Thus, at the very least, the co-conspirators confirmed the identity of respondents and the participation in all events for which they have been charged except the actual shooting. The testimony elicited by respondents concerning the tortured confessions was irrelevant because when first given the opportunity to recant and thus "obliterate" their

**14.** The respondents later introduced translated documents reflecting the proceedings in both state and federal court that support the events

described herein. (Those documents are contained in Extradition V and Exhibits E–M).

prior statements and thus "obliterate" probable cause, the co-conspirators did just the opposite, i.e., they reaffirmed and adopted their prior statements almost in their entirety.

Thus, the evidence here does not support the arguments of respondents. The statements of each of the co-conspirators who allegedly implicated respondents show that when they were given the opportunity to entirely "recant" their allegedly coerced confessions they did not do so. Instead, they specifically adopted all but those portions which would have implicated themselves in the actual shootings. (Vascones did however admit some involvement in the shootings in that he stated that he began shooting his gun).

The *Contreras* court reasoned that while the state of the law is that the respondent is not entitled to introduce contradictory evidence at an extradition hearing, the respondent is entitled to introduce "explanatory" evidence. Since evidence of torture and recantation at first opportunity thereafter would "explain away" any probable cause, absent other independent evidence, it was believed that if such testimony were admitted, probable cause would not exist.

However, as pointed out above, that is not the case here. The co-conspirator confessors failed to recant their confessions when first presented with the opportunity to do so. When they were given further opportunity to provide contradictory information or different versions of the events to agents of the FBI, they failed to do so there as well.

While one might argue that the co-conspirators were intimidated by the presence of the Mexican authorities during the FBI questioning, there was no evidence elicited by respondents to that effect. In fact, the testimony of the FBI agents indicated quite the contrary.

There is sufficient evidence and identity of both respondents as to each offense. The evidence can be summarized as follows:

Respondents agreed to participate in a plan to kill "El Chapo" Guzman, a rival of the Arellano drug cartel. (Extradition I: 130–132; Extradition II: 7–9, 16–18). To carry out the plan, members of the Arellano drug cartel stored and maintained assault weapons and ammunition in houses in Tijuana and Guadalajara. (Extradition I: 43–44, 116–117, 133–136, 159–163, 443–452; Extradition II: 16–17). Respondents were assigned to guard and guarded houses in Tijuana and Guadalajara that secreted the weapons and ammunition. (Extradition I: 43–44, 116–117, 133–136, 159–163, 443–452).

Respondents travelled to Guadalajara in May 1993 as part of the plan to kill "El Chapo" Guzman and his associates. (Extradition I: 130–132; Extradition II: 7–9, 16–18). In Guadalajara, respondents stayed in houses controlled by the Arellano drug cartel. (Extradition I: 133–134). The respondents kept AK–47 machine guns in the houses with them (Extradition I: 133–136), and practiced firing the machine guns. (Extradition II: 8). The respondents' objective while in Guadalajara was to kill "El Chapo" Guzman and his associates (Extradition I: 137).

On May 24, 1993, respondents travelled to the Guadalajara airport (Extradition II: 9–10). While respondents and their co-conspirators were at the airport, they saw "El Chapo" Guzman and recognized "El Chapo" Guzman and several others, as persons they were supposed to kill (Extradition II: 9).

At approximately the same time, Roman Catholic Cardinal Posadas arrived at the Guadalajara airport. Gunfire erupted between respondents and their associates and "El Chapo" Guzman's associates. Seven persons, including Cardinal Posadas, were killed and several other persons were injured from gunfire exchanged between respondents, their associates and "El Chapo" Guzman's associates (Extradition I: 82–84, 146–158, 164–206, 334–430).

### CONCLUSION

The respondents before this court are the Carlos Enrique Garcia and Jesus Zamora–Salas mentioned in the documents submitted and referred to in the testimony offered by the Republic of Mexico. Probable cause exists to believe that the respondents committed the offenses alleged in the charges against them in Mexico. All of the offenses charged against Carlos Enrique Garcia and Jesus Zamora–Salas are extraditable of-

fenses under the extradition treaty between Mexico and the United States.

The extradition request and supporting documents admitted into evidence during the hearings held in this matter are properly authenticated.

Therefore, the court will certify the above and all documents admitted into evidence to the Secretary of State. The Department of Justice shall prepare a certification consistent with this memorandum as required by 18 U.S.C. § 3184.