## In re the Petition of FRANCE for the EXTRADITION OF Philippe SAUVAGE.

### No. 92–4160M.

United States District Court, S.D. California.

Feb. 10, 1993.

---

Mary E. McGuire, Trial Atty., Federal Defenders, Inc., San Diego, CA.

William Braniff, U.S. Atty., Stephen F. Miller, Asst. U.S. Atty., San Diego, CA, for U.S.

## MEMORANDUM DECISION

MOSKOWITZ, United States Magistrate Judge.

Philippe Sauvage is a faith healer from Brittany, France. On December 28, 1990, Sauvage, who's name is Gouezh in Brittany, appeared on the French TV show, "If We Were Told Everything", and discussed his alleged powers to heal the incurable through prayer. An organization named "OJD" accepted money from seriously ill people in return for Sauvage's faith healing services. Numerous persons were not healed and filed complaints with the French authorities. An investigating magistrate in Paris issued an international warrant for the arrest of Sauvage for swindling persons in violation of Section 405 of the French Penal Code. Sauvage was arrested pursuant to that warrant in Escondido, California. France now seeks his extradition.

## I.

In order for this court to certify Sauvage's extraditability, the government must establish: 1) the existence of a warrant for Sauvage's arrest; 2) the existence of a treaty providing for extradition for the charged offense for which the warrant was issued; 3) that Sauvage is the person named in the warrant; 4) that there is probable cause to believe that Sauvage committed the offense charged; and 5) that the facts alleged would also constitute an offense in the United States (dual criminality). 18 U.S.C. § 3184, Treaty of Extradition, Jan. 6, 1909, U.S.–Fr., T.S. No. 561. The defendant concedes that a warrant exists, that he is the person named in the warrant and the offense charged is covered in a valid extradition treaty between the United States and France. Sauvage contests, however, the existence of probable cause and dual criminality.

In support of its extradition request, the government filed the French prosecutor's request for extradition, the Findings of Claude Linas, the investigating magistrate in Paris, a list of approximately 200 complainants and the statements of five witnesses. At a hearing held on January 19 to 21, 1993, the defendant offered evidence as to the elements of Section 405 of the French Penal Code from a French attorney practicing criminal law and evidence explaining the circumstances of the charges against Sauvage. From the record, the following facts emerge.

Philippe Sauvage is a native of Brittany, France. He engages in the practice of faith healing. He contends that God has given him the power to heal the incurable through prayer. Sauvage and his mother have been engaged in this practice for many years. The name "Sauvage" is the French equivalent of "Gouezh" in the language of Britta-

ny—thus the defendant's actual name is Philippe Gouezh.

On December 28, 1990, the defendant appeared on the popular French TV show, "If We Were Told Everything", hosted by Patrick Sabatier. While the government did not present detailed evidence as to what was actually said or represented, it appears that the defendant told of his powers of healing through prayer. Five persons appeared along with Sauvage and told the audience that they had suffered from incurable diseases and cancer but had been cured by Sauvage's prayers. The record is devoid of any evidence as to what the five persons actually represented, what their pre-existing conditions were, and whether any such ailments had in fact existed but were then in remission. In a fraud or swindling case, proof of the actual representations is crucial. Here, the court was not given a transcript of the TV presentation or even a detailed synopsis. However, it appears that Sauvage made no mention of payment for his prayer services and he did not provide an address or phone number for people to contact him. There was no evidence presented that Sauvage was soliciting prayer healing business on the show.

According to the prosecutor and investigating magistrate, the television station received "millions" of letters and phone calls following the broadcast from people seeking to contact Sauvage so they or their relatives could be healed. In response, the television station broadcasted Sauvage's address.

The letters sent to the television station were gathered by Sauvage's friend, Marie-Josee Peiffer, who contends she was cured by Sauvage's prayers. Peiffer organized a company called "Ordalie Jugement de Dieu" (OJD) (the Ordeal by God's Judgment) to select persons for Sauvage to pray for and collect payments for his services. Certain letters were selected and their authors normally were contacted by Peiffer or other persons connected with OJD. One declarant, Jeanne Virleux, stated that a person claiming to be Sauvage himself called her from his car phone and directed her to call his office for an appointment to speak to his assistant. Many persons also called Sauvage's phone number in Plouaret, Brittany, where a woman answered and gave them Sauvage's address in Nanterre.

OJD agents allegedly identified approximately 500 persons who could possibly benefit from Sauvage's prayers. OJD personnel would contact these people, interview them and request a lock of hair, a photograph, and sometimes a sample of the person's writing all of which were to be given to Sauvage who allegedly could work his miracles through prayer without ever meeting the afflicted. The OJD agents further required a downpayment of from 6,000 to 30,000 francs in order for Sauvage to begin his healing efforts. Some portion of the funds collected were to be used for charitable purposes. Those seeking Sauvage's help were also required to sign an "Intercession Protocol", explaining what the patients could expect from Sauvage. The Protocol was sometimes signed before paying the downpayment, and at other times, it was not signed until after the downpayment had already been paid. The "Intercession Protocol" read in part,

3) Aknowledging [sic] that, concerning the exclusively metaphysical dimension in which such an intercession could be set up, I am not expecting any kind of effect, physically or concretely perceptible and I admit completely and without any reserves that *from a materialistic point of view it should be totally chimerical to fear or to expect the coming of any demonstrable or even simply objectivable [sic] event and similarly, regarding the exclusive spiritualistic perspective inside of which Philippe Gouezh is taking place, such an expectation would be the very constitutive element of a highly blasphemous approach.*

. . . .

5) Admitting that Philippe Gouezh's task consists exclusively in praying for the Soul salvation of the rare "elect" whom he allows himself to accept—*regarding his cruel uniqueness in front of the burdens that God laid upon him* —. He is susbtantially [sic] applying for the mercy of The Lord who solely could relieve the ordeals from which the people are subjectively afflicted due to their own sinning nature and

because of the predictible [sic] extreme inanity of their own existence (cf. "The parable of the talents").

(Def. Ex. A., emphasis in original).

Some people complained to the French authorities that they paid money to OJD and had not been healed, but rather, their condition had deteriorated. The police sent a letter to all persons who had contacted Sauvage, explaining that the arraignment judge had charged Sauvage, among others, with fraud, false advertising, and illegal practice of medicine. The police asked whether any person wished to file a complaint. A list of the names of approximately 200 complainants was submitted to the court as an appendix to the French prosecutor's request for extradition. The government submitted declarations from only five of those complainants. The French prosecutor also stated in his request for extradition that "an important stock of war weapons" were discovered in Sauvage's residence. In fact, two guns, a handgun and a hunting rifle of forbidden caliber, were found. No request for extradition is brought for firearms violations.

According to the evidence presented, OJD agents advised Jean Papin, Jeanne Virleux, Djedligua Merbouche, and Fabrice Marchal that the afflicted person should discontinue his or her chemotherapy or other traditional medical treatment. However, Jeanine Girault stated that OJD's agents did not advise her to discontinue the physiotherapy prescribed for her paralysis.

OJD agents also told the persons contacted that some of the funds collected would go to charitable organizations and causes. It is not clear as to the proportion of the funds that were represented to go to charitable causes. OJD collected approximately five million francs. The evidence is clear that at least 300,000 francs of the money collected was donated to various charitable causes related to the preservation of the environment, certain animal species, and native peoples [1] and 900,000 francs was used in some form for the purpose of preservation of the Inuit peo-

ples in Greenland. OJD funds were also used to purchase a boat and a Mercedes. The boat, a 34-foot motor vessel, was allegedly used in the resettlement of the Inuit natives in Greenland. The government submitted no evidence to show that Sauvage directly received any funds from OJD or even possessed the Mercedes. However, Sauvage appears to have been provided with subsistence from OJD while he was in Greenland planning for the opening of an "archeotherapy center" where more wealthy patients could stay for healing. Sauvage allegedly prayed for some of the people while he was residing in Greenland.

Notwithstanding OJD's promises of curative prayer by Sauvage, the five persons noted in the declarations among other subscribers were not healed and two of the five afflicted persons described in the declarations died.

A warrant was issued for Sauvage's arrest. He was later arrested in Escondido, California, living under a false name and with a false passport. He had received approximately $40,000 from Madame Peiffer in the period following issuance of the warrant. However, it is clear that these were Peiffer's personal funds, in part from the sale of her house, and not those raised by OJD. Peiffer herself was arrested in France and charged with swindling under French criminal law for her activities in connection with OJD.

## II.

In an extradition proceeding, the court is not required to decide guilt or innocence but "to determine whether there is competent legal evidence to justify holding the accused for trial. The magistrate's function is merely to determine whether there is 'any evidence warranting the finding that there was reasonable ground to believe the accused guilty.'" *Matter of Extradition of Russell,* 789 F.2d 801, 802 (9th Cir.1986) (quoting *Fernandez v. Phillips,* 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970 (1925)) (citations omitted). An additional prerequi-

---

1. Specifically, the recipients were the Organization Against Cruelty to Animals & Lab Experiments, the Oglala Sioux, Liberation of the Mohawk Nation in Canada, "Robin Hood" (an organization dedicated to the protection of mankind and the environment), the Society for the Protection of Nature in Israel, and the Reforestation Immunization Project of Nigeria.

site for extradition is a finding of dual criminality, that is, the conduct involved must be criminal in both the country requesting extradition and the country having custody of the accused. *Russell*, 789 F.2d at 803; *Yin-Choy v. Robinson*, 858 F.2d 1400, 1404 (9th Cir.1988), *cert. denied*, 490 U.S. 1106, 109 S.Ct. 3157, 104 L.Ed.2d 1020 (1989).

An extradition treaty between the United States and France is in full force and effect and allows extradition for "larceny: obtaining money, valuable securities or other property by false pretenses, when such act is made criminal by the laws of both countries, and the amount of money of the value of the property fraudulently obtained is not less than two hundred dollars or one thousand francs." Treaty of Extradition, Jan. 6, 1909, U.S.–Fr., art. II, para. 8, T.S. No. 561 at 5. Sauvage has been charged by the French government with swindling in violation of Article 405 of the French Penal Code. The United States argues that Sauvage's conduct would be criminal in the United States as theft, Cal.Penal Code § 484 (West 1993), false representations in solicitation of charitable contributions, Cal.Penal Code § 532d (West 1993), or false advertising, Cal.Bus. & Prof.Code § 17500 (West 1993).

■ Section 532d, Cal.Penal Code, prohibits false statements "concerning the purpose or organization for which the money or property is solicited or received . . . or the manner in which the money or property or any part thereof is to be used. . . ." There is no evidence by which the court could reasonably believe Sauvage guilty of this offense. First, there is no evidence that Sauvage himself made any statement concerning the intended use of the funds collected for his healing prayers, or was aware of any such statements made by others. Second, even if the court were to infer that Sauvage must have authorized such statements by OJD, it is impossible to determine whether such statements as to how the funds were to be used were false because the government has not provided any actual evidence as to what was said. Thus, we do not know whether the representation was that all, most, or some of the money was to be used for charitable purposes. The only evidence before the court is the conclusory statements in the prosecutor's and investigating magistrate's findings. If the representation were that "some" of the money was to be used for charitable purposes, then the representation was not false. Indeed, the investigating magistrate's finding was that the patients "were informed that the payments were not solely given to Philippe Gouezh himself but were also given to ecological and humanitarian societies." Warrant of arrest at 4. The evidence does not prove this representation to be false. The five declarations submitted are silent on the purpose for which the fees were to be utilized. Without knowing the exact representations made, it is impossible to determine whether they were false. Thus, the facts do not establish probable cause to believe Sauvage violated Section 532d of the California Penal Code.

Under both the French swindling statute and the American statutes prohibiting false advertising and theft, a knowledge or intent requirement must be proved in order to convict. A finding of violation of Article 405 [2] requires proof of the following four elements, as relevant to this case: (1) a criminal intent, generally required in the French criminal law, (2) fraudulent actions to persuade others of an imaginary power or credit, (3) obtaining or attempting to obtain funds, and (4) by these means swindling or attempting to swindle someone totally or partially out of their wealth. C. pen., art. 405. Section 484, Cal.Penal Code, requires proof that the accused "knowingly and designedly, by any false or fraudulent representation or pretense, defraud[ed] any other person. . . ."

---

2. Article 405 states,

   Anyone, either using false identities or titles, or acting fraudulently to persuade others of the existence of false companies, of an imaginary power or credit or to raise up hopes or fears of success, of accidents or all other chimerical event, will have obtained or tried to obtain funds, furniture, bonds, notes, agreements, receipts, and will have through one of these means swindled or attempted to swindle totally or partially someone's wealth will be condemned to imprisonment for one to five years at the most and to pay a fine of at least 3 600 francs and 2 500 000 francs at most. C. Pen., art. 405.

Section 17500, Cal.Bus. & Prof.Code, makes it unlawful for any person to make or disseminate before the public any statement concerning property or services which is untrue or misleading and is known or should be known by the exercise of reasonable care to be untrue or misleading. Therefore, in order to establish probable cause and also dual criminality, the government must present some evidence warranting a reasonable ground to believe that Sauvage had a criminal intent or knew or reasonably should have known that the statements made by him or those acting in concert with him were false.

The required state of mind could be proved either by evidence tending to show that Sauvage did not genuinely believe that he could heal through prayer or by evidence tending to show that he knew the persons appearing with him on the television show were not healed or were not healed by him. The government has presented no evidence of the representations actually made by Sauvage on the television show nor has the government presented any evidence that the former patients who spoke thereon were not healed by Sauvage. The government's evidence shows only representations made by OJD agents. With no evidence that Sauvage authorized OJD agents to make these statements, or had knowledge of the statements, the evidence is of little weight in determining probable cause for extradition. Evidence of the actual representations made by Sauvage on television would seem to be readily available to the government. Further, there is no evidence from which this court could infer that Sauvage did not believe in his power of faith healing. Thus, the government lacks evidence on an essential element of both the French and American crimes.[3] This court, therefore, finds insufficient evidence to warrant a finding that there is reasonable or probable cause to believe the accused guilty.

The element of fraudulent intent is crucial in this case because without this requirement of proof, the sincerity or good faith by Sauvage in his religious beliefs would be irrelevant. The issue would then become whether Sauvage or anyone could heal persons through prayer to God. The government contends that it is preposterous to believe that Sauvage can actually obtain the assistance of a higher being to heal other persons. The government points to the five declarations to demonstrate that Sauvage cannot heal through prayer. Sauvage tried to offer evidence of the many people that claim he has healed them. The court denied admission of this evidence sustaining the government's objection that it was contradictory evidence inadmissible in the extradition hearing. The issue is not whether Sauvage can invoke the powers of a higher being to effectuate a cure, rather, the question is whether Sauvage in good faith believes he has that power. If the government were to obtain fraud convictions of persons who solicit funds in return for religious blessings, the guarantees of free exercise of religion under the First Amendment to our Constitution would be in serious jeopardy.

The Supreme Court of the United States recognized the peril to religious freedom that could result from a similar prosecution in the absence of proof to negate the existence of a good faith belief in the "religious solicitation". In *United States v. Ballard*, 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944), the defendants were prosecuted for mail fraud, which also requires proof of intent to defraud. The defendants in that case had organized a religious movement through which they, in part, solicited funds for faith healing. They represented that three of the defendants had attained the power to heal persons of curable and incurable diseases, injuries or ailments and that they had in fact previously cured people of such diseases, injuries or ailments. The United States Supreme Court upheld the District Court's jury instructions which stated,

The question of the defendants' good faith is the cardinal question in this case. You are not to be concerned with the religious belief of the defendants, or any of them. The jury will be called upon to pass on the question of whether or not the defendants honestly and in good faith believed the

---

**3.** Although Sauvage's conduct may have violated statutes without a knowledge or intent requirement, for example, prohibiting the practice of medicine without a license, *See* Cal.Bus. & Prof. Code § 2053 (1992), those offenses are not extraditable offenses under the treaty.

representations which are set forth in the indictment, and honestly and in good faith believed that the benefits which they represented would flow from their belief to those who embraced and followed their teachings, or whether these representations were mere pretenses without honest belief on the part of the defendants. . . .

. . . .

Therefore, the religious beliefs of these defendants cannot be an issue in this court. The issue is: Did these defendant's honestly and in good faith believe those things? If they did, they should be acquitted.

*Id.* at 81–82, 64 S.Ct. at 883–884.

In concluding that the defendants could not be convicted on proof of the factual falsity of their religious beliefs, including the power to heal through prayer, the Supreme Court stated:

> [W]e do not agree that the truth or verity of respondent's religious doctrines or beliefs should have been submitted to the jury. Whatever this particular indictment might require, the First Amendment precludes such a course as the United States seems to concede. . . . Freedom of thought, which includes freedom of religious belief, is basic in a society of free men. . . . Men may believe what they cannot prove. They may not be put to the proof of their religious doctrines or beliefs. Religious experiences which are as real as life to some may be incomprehensible to others. Yet the fact that they may be beyond the ken of mortals does not mean that they can be made suspect before the law. . . . The miracles of the New Testament, the Divinity of Christ, life after death, the power of prayer are deep in the religious convictions of many. If one could be sent to jail because a jury in a hostile environment found those teachings false, little indeed would be left of religious freedom. The religious views espoused by the respondents might seem incredible, if not preposterous, to most people. But if those doctrines are subject to trial before a jury charged with finding their truth or falsity,

then the same can be done with the religious beliefs of any sect. . . .

322 U.S. at 86–87, 64 S.Ct. at 886.

Thus, the First Amendment would preclude conviction of Sauvage in the United States for fraud unless it were established that he did not honestly and in good faith hold a belief that he had been given the power by God to heal through prayer and that he could actually heal the people solicited. The government could prove this with evidence that Sauvage was aware at the time he made the representations that he had been unsuccessful in such attempts. Further, in this case, fraud could be established by proof that Sauvage was aware that the five people on the TV show had either never been ill as represented, were not cured, or were not cured by him. The government has offered no such evidence. The government could also prove fraud by connecting Sauvage to misrepresentations as to how the funds received were to be spent. As noted above, the record does not establish probable cause as to this alleged violation.

■ The government argues that this court should accept the French prosecutor's and investigating magistrate's findings as evidence of criminal intent. These findings are certainly admissible evidence in an extradition proceeding. 18 U.S.C. § 3190 (1992). The question is how much weight should the court give to them in determining probable cause. The treaty states that persons shall be extradited "upon such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his or her apprehension and commitment for trial if the crime or offence had been there committed." Treaty of Extradition, Jan. 6, 1909, U.S.–Fr., art. I, T.S. No. 561 at 4. In *Pettit v. Walshe,* 194 U.S. 205, 217, 24 S.Ct. 657, 661, 48 L.Ed. 938 (1904), the U.S. Supreme Court held that this language means that the evidence of criminality shall be examined under the laws of the state where the person is found, in this case, the law of California. To support a finding of probable cause under either federal or California law, an affidavit must contain factual support for the affiant's conclusions and either an assertion that the affiant

speaks from personal knowledge or a statement of the sources for the affiant's belief and the circumstances from which the affiant concluded that the sources were reliable and credible. *See Giordenello v. United States,* 357 U.S. 480, 486, 78 S.Ct. 1245, 1250, 2 L.Ed.2d 1503 (1958); *Illinois v. Gates,* 462 U.S. 213, 239, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1989); *People v. Campa,* 36 Cal.3d 870, 879–80, 206 Cal.Rptr. 114, 686 P.2d 634 (1984) and *In re Walters,* 15 Cal.3d 738, 748, 126 Cal.Rptr. 239, 543 P.2d 607 (1975). The French prosecutor's request for extradition and the investigating magistrate's statement in the international warrant do not meet this standard. They do not state the source of their factual findings. Therefore, this court cannot give weight to their findings because it cannot evaluate the factual basis for those findings.

The government cites *Emami v. United States Dist. Ct. for N.D.Cal.,* 834 F.2d 1444 (9th Cir.1987), for the proposition that the court must accept the factual findings of the French authorities as evidence establishing probable cause. However, the prosecutor's affidavit in *Emami* contained detailed summaries of witnesses' statements, not merely the prosecutor's conclusions.

Moreover, in this case, the investigating magistrate made no factual findings concerning Sauvage's criminal intent. Instead, the government would have this court rely upon the French magistrate's ultimate conclusion that "[n]o one can doubt Philippe GOUEZH's guiltiness ..." when he never saw his patients personally but "pretend[ed] to cure them from over a distance." While the French magistrate may very well have made this finding based on sufficient evidence, this court cannot simply adopt that conclusion of guilt on the element of intent. The treaty between the United States and France requires this court to make an independent determination from evidence as to probable cause including the existence of the element of criminal intent. Treaty of Extradition, Jan. 6, 1909, U.S.–Fr., art. I, T.S. No. 561 at 4. The government has simply failed to offer the evidence which supports the investigating magistrate's finding.

The government further argues that Sauvage fraudulently represented to one of the declarants, Jean Papin, that his faith healing powers were 100% guaranteed knowing that statement to be false. However, there is no evidence that Sauvage himself made this statement. Additionally, the Intercession Protocol language quoted above shows that Sauvage did *not* believe his powers were 100% effective, that is, that every person he prayed for would be healed. Jean Papin states in part the following:

> Moreover she [Ms. Peiffer] justified the amount of that sum because of the inefficiency of the traditional medicine which could do nothing for our son.
>
> She also told us that, for GOUEZH's power to be 100% effective, it would be preferable to stop chemotherapy which my son was undergoing; it was weed-killers.
>
> I am also making clear that the so-called VOLAN with whom we were in contact over the phone, also told us that GOUEZH could not well intervene if our son was undergoing chemotherapy which he called weed-killer.
>
> . . . .
>
> Since she [Ms. Peiffer] told me to keep GOUEZH informed of the evolution of my son's disease, fifteen days later, the wife of my son wrote that my son's condition was stationary.
>
> During May, my wife wrote a letter to GOUEZH to say that there was no improvement in my son's condition.
>
> PEIFFER answered each letter saying that as long as my son was undergoing chemotherapy, it was impossible to obtain satisfactory result from GOUEZH.

(Papin Decl. at 2–3.)

First, Papin avers that the statements were made by Peiffer, not by Sauvage, and there is no evidence that Sauvage authorized those statements. Second, the court finds that Peiffer was not stating that 100% of Sauvage's patients are healed if they stop their chemotherapy, but only that Sauvage's powers would not be most effective and Papin's son could not attain 100% health unless he stopped his chemotherapy.

**904**

■ The government also asserts that Sauvage's flight from Greenland to the United States under a false passport shows a consciousness of guilt which is inconsistent with a sincere belief in his power to heal.

"Evidence of flight is generally admissible as evidence of consciousness of guilt and of guilt itself." Since "flight" is essentially an admission by conduct, its probative value as circumstantial evidence depends upon the degree of confidence with which four inferences can be drawn:

(1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged.

*United States v. Felix–Gutierrez,* 940 F.2d 1200, 1207 (9th Cir.1991) (quoting *United States v. Harris,* 792 F.2d 866, 869 (9th Cir.1986) and *United States v. Myers,* 550 F.2d 1036, 1049 (5th Cir.1977)). The probative value of the evidence of Sauvage's flight to the United States breaks down on the second inference. First, Sauvage was already outside of French boundaries in Greenland, a Danish dependent, when the investigating magistrate made his findings. Sauvage went to Greenland for one of two purposes, neither of which was to escape French prosecution. He went to Greenland either to establish an "archeotherapy center," as claimed by the investigating magistrate, or to aide in efforts to preserve the Inuit peoples. Second, Sauvage's flight does not necessarily show that his belief in his healing powers was insincere, and thus, that he knew he had the required criminal intent. He could have simply feared that although he believed in his powers, the French court would not be a believer. This court does not find the evidence of flight in this case sufficient to justify an inference as to Sauvage's criminal intent or guilty knowledge.

■ The government argues that, even if Sauvage did believe in his power of faith healing, he reasonably should have known that he could not heal persons through prayer because those beliefs, the government argues, are implausible and impossible. The First Amendment, however, precludes the court from examining the truth of Sauvage's beliefs.

"[A]lthough the validity of religious beliefs cannot be questioned, the sincerity of the person claiming to hold such beliefs can be examined." *United States v. Rasheed,* 663 F.2d 843, 847 (9th Cir.1981), *cert. denied,* 454 U.S. 1157, 102 S.Ct. 1031, 71 L.Ed.2d 315 (1982). However, the government has presented no evidence tending to show Sauvage's insincerity or what he knew or reasonably should have known at the time the representations were made. Should Sauvage continue to make unqualified statements of his powers, in the face of the French complainants, good faith may be an issue. However, there is no evidence he was aware of failure at the time the representations were made. The simple fact that Sauvage may have accepted money through OJD in exchange for his healing prayers does not raise the inference that he was not sincere in his belief in his powers and, thus, had criminal intent.

The basic problem with the government's case is that it ignores the intent element. The government would have this court extradite Sauvage based only upon evidence that he said he was a faith healer, OJD accepted money for Sauvage's faith healing services and the afflicted were not cured. In order to find Sauvage extraditable, there must be probable cause to believe that he did not sincerely believe that he had these powers. This court cannot make that finding on the present state of the record.

### III

There being no probable cause to believe Sauvage committed the offenses charged and the facts established not constituting a criminal offense in the United States, the present application of France for the extradition of Philippe Sauvage is denied, without prejudice.

IT IS SO ORDERED.