**In the Matter of the EXTRADITION OF Raymond C. LIN, Defendant.**

No. 95–0054.

District Court of Guam.

Nov. 14, 1995.

Mikel W. Schwab, Assistant U.S. Attorney, Agana, Guam, for plaintiff.

John F. Tarantino, Agana, Guam, for defendant.

## MEMORANDUM ORDER

UNPINGCO, Chief Judge.

This matter came before the Court on Tuesday, September 26, 1995, at 11:00 a.m., on detainee's extradition hearing. The Court has considered the facts and arguments raised by the parties in their pleadings and at the extradition hearing. For the reasons which follow, the Court finds the Detainee. Mr. Raymond C. Lin to be extraditable and hereby enters a Certification of Extraditability.

## BACKGROUND

Pursuant to 18 U.S.C. § 3184 and the Agreement on Extradition, Mutual Assistance in Law Enforcement Matters and Penal Sanctions Concluded Pursuant to Section 175 of the Compact of Free Association (the "Extradition Treaty"), these extradition proceedings were initiated on September 7, 1995, by the United States Attorney on behalf of the National Government of the Republic of Palau ("Palau"). On January 9, 1995, Palau formally filed a "Request for Extradition" with the United States Department of State. Palau seeks extradition of Mr. Lin to try him for the following alleged offenses: (1) Bribery, 17 Palau National Code § 701; (2) Attempted Bribery, 17 Palau National Code § 104; (3) Conspiracy to Commit Bribery, 17 Palau National Code § 901; and (4) a Violation of the Foreign Investment Act, 28 Palau National Code § 113(b). Mr. Lin was arrested on September 16, 1995, based on a complaint filed in this Court by the United States under 18 U.S.C. § 3184 seeking his extradition to Palau. This Court held an initial appearance

hearing on September 18, 1995; as well, at the request of detainee's counsel a detention hearing was held on September 19, 1995 and the extradition hearing on September 26, 1995.

The detainee, Mr. Lin, a 30–year old male, is a citizen of the Republic of China ("Taiwan") who has been a residing in Guam since 1993. Mr. Lin is a graduate of the National Kaoshiung Marine College, Kaoshiung, Taiwan with a degree in fishery. He has been employed by Ting Hong Oceanic Enterprises Co., Ltd. of Taiwan from 1989 to the present. In 1993, Mr. Lin was transferred to Guam to manage Ting Hong's Guam Branch.

## DISCUSSION

■ The United States' extradition process and procedure is set forth in 18 U.S.C. §§ 3181–3195. Under this statutory scheme, the extradition judge conducts a hearing in which the Government must establish the following jurisdictional and legal elements: (1) the Court has jurisdiction over the subject matter and individual; (2) the crime charged is an extraditable offense under the treaty; (3) that there is probable cause that the detainee committed the alleged offenses; and, (4) the detainee has not shown by a preponderance of the evidence a valid defense to the extradition. 18 U.S.C. § 3184; *See also Hooker v. Klein,* 573 F.2d 1360, 1367 (9th Cir.1978), *cert. denied,* 439 U.S. 932, 99 S.Ct. 323, 58 L.Ed.2d 327 (1978); *In re Petition of France for the Extradition of Philippe Sauvage,* 819 F.Supp. 896, 897 (S.D.Ca. 1993); *Matter of Demjanjuk,* 603 F.Supp. 1468, 1470 (N.D.OH 1985), *citing, Bingham v. Bradley,* 241 U.S. 511, 36 S.Ct. 634, 60 L.Ed. 1136 (1916). If based on the evidence presented in the extradition hearing the government establishes these factors then the court may certify a detainee's extraditability.

### 1. *Jurisdiction*

There are several procedural and substantive jurisdictional requirements to be met for this Court to hear an extradition case. The statutory authority under 18 U.S.C. § 3184 provides for "any judge of the United States" to hear extradition cases provided: (a) there is an extradition treaty in effect between the United States and the requesting nation; (b) there is a criminal charge pending in the requesting nation; (c) that the detainee before the court is, in fact, the same individual charged in the requesting nation.

First, the Government presented a properly authenticated declaration by Elizabeth M. Kiingi an attorney-advisor in the Office of Legal Advisor for the United States Department of State (the "State Department Declaration") declaring that the Extradition Treaty between the United States and Palau is in full force and effect. Second, to show a pending criminal charge in Palau, the requesting nation, the Government presented several properly authenticated documents. Specifically, the following items were offered: the State Department Declaration, the government of Palau's "Request for Extradition", and the Republic of Palau's Warrant of Arrest, signed by Arthur Ngiraklsong, Chief Justice, Supreme Court. The authentication requirements set out in 18 U.S.C. § 3190 have been met. The Department of State Declaration was properly authenticated by virtue of an attached Certificate of Authentication signed by Warren Christopher, United States Secretary of State. The documents provided by the Republic of Palau are properly authenticated as evidenced by a Certificate of Authentication signed by Richard G. Watkins, resident representative of the United States at Koror, Palau. And lastly, at the initial hearing on September 18, 1995, the detainee conceded that he was the individual charged. As all jurisdictional requirements have been met this Court has jurisdiction over the extradition proceedings of Mr. Lin.

### 2. *Extraditable Offense*

■ Closely related to the jurisdictional inquiry above is the question of whether the offenses charged are extraditable "treaty offenses". To make this showing the extradition court must find that the treaty is in full force and effect and that the crimes charged fall within the terms of the treaty. *Quinn v. Robinson,* 783 F.2d 776, 782–783 (9th Cir.), *cert. denied,* 479 U.S. 882, 107 S.Ct. 271, 93 L.Ed.2d 247 (1986); *See also Oen Yin–Choy v. Robinson,* 858 F.2d 1400 (9th Cir.), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3157, 104

L.Ed.2d 1020, *reh. denied,* 492 U.S. 927, 109 S.Ct. 3267, 106 L.Ed.2d 612 (1988). As this Court has already set out its finding that the Extradition Treaty is in full force and effect the analysis in this section will focus on the second part of the required showing.

A court's inquiry of whether the offense comes within the terms of the treaty will vary based on the provisions set out in the treaty. In this case, pursuant to Article II of the Extradition Treaty an offense is extraditable if it is listed as an extraditable offense in the Schedule of Offenses and meets the requirement of dual criminality, or, if it is not listed, it nevertheless satisfies the dual criminality requirement.

The offenses of bribery, attempted bribery and conspiracy to commit bribery are all listed in the Schedule of Offenses. *See* Extradition Treaty, Appendix A, Schedule of Offenses, para. 10; Extradition Treaty Title II Extradition, Art. II Extraditable Offenses, para. 3(a). The additional requirement of dual criminality requires a more probing inquiry.

■ The dual criminality doctrine, for extradition purposes, is the requirement that the charged conduct be illegal in both the requesting and requested nations. *Quinn,* 783 F.2d at 783. The proper inquiry centers on the alleged conduct and does not require the finding of identical criminal statutes or counterparts. *Bozilov v. Seifert,* 983 F.2d 140, 142 (9th Cir.1993). In practice the court's role is to compare the law of the surrendering state with the law of the requesting state; if the conduct alleged is subject to criminal prosecution in both states the dual criminality requirement is met. *United States v. Saccoccia,* 58 F.3d 754, 766 (1st Cir.1995); *see also Collins v. Loisel,* 259 U.S. 309, 312, 42 S.Ct. 469, 470, 66 L.Ed. 956 (1922) ("It is enough (to satisfy the requirement of dual criminality) if the particular act charged is criminal in both jurisdictions"). At the extradition hearing the Court conducted a comparison of the charged provisions of the Palau National Code with similar provisions of federal law. *Peters v. Egnor,* 888 F.2d 713, 716 (10th Cir.1989) (holding that in determining the dual criminality issue a full-blown or extensive review of the foreign na-

tion's criminal law is not required or appropriate). Based on this examination, and its further research and reexamination the Court has found that the essential elements of both the Palau offense of bribery and the equivalent United States Federal offense are indistinguishable. Therefore, as to the charge of bribery the doctrine of dual criminality is satisfied. *Compare* 17 PNC § 701 *and* 18 U.S.C. § 201.

■ With respect to the charge of attempted bribery, the Palau offense of attempt requires that the defendant intend to commit the underlying offense yet the attempt must "fall short of actual completion". Under United States federal law, criminal attempt is similar but requires a somewhat more direct and immediate connection to the intended crime, a "substantial step". *United States v. Nelson,* 66 F.3d 1036 (9th Cir.1995) (a finding of attempt requires evidence of intent to violate the crime and a "substantial step" toward the completion of the crime). Therefore, there is a distinction in the relative connection between the actual act and the underlying "attempted" crime. Despite this, based on the facts and evidence presented, in this case, the dual criminality requirement is still met. *United States v. Khan,* 993 F.2d 1368, 1372 (9th Cir.1993) (holding that dual criminality was satisfied, despite differences, because defendant could have been charged with offense in both countries); *Bozilov,* 983 F.2d at 142. Based on the alleged actions Mr. Lin could be charged under both Palau and United States law for attempted bribery.

■ Next, as to the charge of conspiracy, the U.S. and Palau crimes are identical in that they both require an agreement and intent to commit the underlying crime. *Compare* 17 PNC § 901 *and United States v. Mesa–Farias,* 53 F.3d 258, 259 (9th Cir.1995) (holding that the two principal elements to a conspiracy offense are an agreement to and intent to commit the underlying offense). However, they differ in one respect, Palau requires a higher burden of proof to be met, i.e., proof of an overt act, whereas the United States, generally, does not. *United States v. Shabani,* — U.S. —, 115 S.Ct. 382, 130

L.Ed.2d 225 (1994) (absent contrary indications, Congress intends to adopt the common law definition of statutory terms, such as, conspiracy; conspiracy at common law does not require an overt act). Thus, in this case the dual criminality requirement is still met. *Khan,* 993 F.2d at 1372; *Bozilov,* 983 F.2d at 143. In *Khan,* the Ninth Circuit held that dual criminality was satisfied by conspiracy charge, despite differences, because defendant could have been charged with the offense in both countries. Further support is offered by *In re Russell,* 789 F.2d 801, 804 (9th Cir.1986), where it was held that to satisfy the dual criminality requirement it is not required that each element of alleged offense be identical; it is sufficient that the conduct alleged satisfies the criminal elements in both countries. Specifically, *In re Russell* stated that conspiracy charges are extraditable offenses despite differences in their requirements of "overt act". Finally, as to the fourth charge, violation of the Foreign Investment Act, the doctrine of dual criminality has not been satisfied because the Palau Foreign Investment Act is unique to Palau.

### 3. *Probable Cause*

■ The court's role in determining extraditability also requires a limited evidentiary finding. It is not required that there be sufficient evidence presented to support a conviction, but merely to evaluate " 'whether there was any evidence warranting the finding that there was a reasonable ground to believe the accused guilty.' " *Oen Yin–Choy,* 858 F.2d at 1407, *quoting, Theron v. United States Marshal,* 832 F.2d 492, 495 (9th Cir. 1987), *cert. denied,* 486 U.S. 1059, 108 S.Ct. 2830, 100 L.Ed.2d 930 (1988). This limited standard has been held to be analogous to a magistrate's role, under United States law, in determining whether or not to hold a defendant to answer to a charged offense. *Emami v. United States District Court for the Northern District of California,* 834 F.2d 1444, 1447 (9th Cir.1978).

■ At the extradition hearing the Government offered the following properly authenticated documentary evidence in support of their request for extradition:

(1) Republic of Palau, Warrant of Arrest, dated January 6, 1995. This warrant charged the detainee with the four offenses described above.

(2) Republic of Palau, Information, dated January 6, 1995.

(3) Affidavit of Probable Cause, dated January 6, 1995. This affidavit filed by a Palau Law Enforcement Officer sets out the substance of the evidence against detainee, Mr. Lin.

(4) First Amended Affidavit of Probable Cause, dated March 21, 1995. This affidavit filed by a Palau Law Enforcement Officer sets out additional evidence against detainee, Mr. Lin.

This evidence showed, inter alia, that Mr. Raymond Lin is an officer of Ting Hong Oceanic Enterprises Co., Ltd. ("Ting Hong"), a Palau corporation since October 13, 1993. In 1993, Ting Hong applied to the Palau Foreign Investment Board ("FIB") for a Foreign Investment Approval Certificate. Ting Hong's application listed Raymond Lin as Ting Hong's application point of contact. The application was signed by Chuan Chen Lin. Based on a Palau Law Enforcement Officer's comparison of this signature with that of Raymond Lin it was determined that Chuan Chen Lin, the application signatory, is Raymond Lin.

On November 30, 1993 the Palau FIB held a secret ballot on Ting Hong's application for a Foreign Investment Approval Certificate. This secret ballot did not result in approval; the result was a three to three tie. On several occasions in 1993, Mr. Lin, and/or his known Palau agents, delivered or attempted to deliver money to voting members of the Republic of Palau, Foreign Investment Board ("Board"). These transactions were conducted by Mr. Lin and other agents of Ting Hong in an attempt to influence the Board's determination on Ting Hong's application for a Foreign Investment Approval Certificate.

Specifically, on or about December 1993, J. Roman Bedor, a voting member of the FIB, was approached by Rose Mesubed with an envelope containing five thousand U.S. dol-

lars ($5,000.00). Mesubed stated that she was instructed by Angelo Udui, Raymond Lin's Palau agent, to offer Bedor the money and solicit his support for Ting Hong's Foreign Investment Approval Certificate. Bedor refused the money. As well, Bedor was informed by Moses Ngirasowei, also a voting member of the FIB, that he had been approached by Udui and Lin on behalf of Ting Hong. In December of 1993, Udui, in the presence of Lin offered Ngirasowei money, in exchange for his support and approval of Ting Hong's Foreign Investment Approval Certificate. Udui handed Ngirasowei an envelope containing three thousand U.S. dollars ($3,000.00).

On January 19, 1994, the FIB by secret ballot approved Ting Hong's Foreign Investment Approval Certificate by a vote of four to one. Later that month, on January 26, Ngirasowei, through his wife, was again contacted by Udui, Raymond Lin's Palau agent. At that time, Ngirasowei returned the three thousand dollars ($3,000.00). Nevertheless, Udui told Ngirasowei that once Ting Hong's fishing operations commenced, Ting Hong would do business with Ngirasowei's retail grocery store.

Accordingly, the Court finds that based on the totality of the facts and circumstances presented there is sufficient evidence to find probable cause that the detainee has committed the crimes alleged. Thus, there is competent legal evidence to justify extraditing Mr. Lin to Palau.

### 4. Detainee's Defense

Detainee did not offer any evidence or argument supporting a possible defense to the underlying charges. However, detainee has argued in his defense that the extradition statute, 18 U.S.C. § 3184, is unconstitutional. And therefore the Government's extradition request should be denied. This argument is based totally on *Lobue v. Christopher,* 893 F.Supp. 65 (D.D.C.1995).

Detainee, Mr. Lin, relies on two grounds, both founded on this recent opinion from the District Court of the District of Columbia, in his request that this Court deny the Government's extradition request. The detainee has argued that in view of the *Lobue* decision this Court is prevented from proceeding under the extradition statute or, alternatively, this Court should follow the *Lobue* decision and find the statute to be unconstitutional. This Court declines to accept either position.

#### (a) *Not Binding on This Court*

■ On August 31, 1995, the District Court for the District of Columbia held that 18 U.S.C. § 3184, the extradition statute, was unconstitutional. This decision was based on that court's opinion "that the extradition statute purports to confer upon the Secretary of State the power to review and set aside the legal conclusions of federal extradition judges" in violation of Article III of the U.S. Constitution. *Lobue v. Christopher,* 893 F.Supp. 65 (D.D.C.1995).

■ The *Lobue* decision is not binding on this Court for three alternative reasons. First, the *Lobue* Court's September 15, 1995 modified order certified as a class all persons now or in the future under threat of extradition pursuant to § 3184 and enjoined the government from "surrendering under Title 18, § 3184, *et seq.,* of the United States Code, the plaintiffs or any member of the plaintiff class to another nation, pending further order of this court". *Lobue v. Christopher,* 893 F.Supp. 65 (D.D.C.1995). This injunction goes to the Secretary of State's surrendering of an extraditable detainee and does not extend to judicial extradition proceedings. Furthermore, on September 29, 1995, the United States Court of Appeals for the District of Columbia issued an order staying this injunction as to all persons other than the parties in the *Lobue* case. Second, the *Lobue* decision is not binding on this Court because while this Court may consider the views and opinions of a district court in a different circuit this Court is not bound to follow them. *Colby v. J.C. Penney Co.,* 811 F.2d 1119, 1124 (7th Cir.1987) (District Court decisions do not create binding precedent); *see also Starbuck v. City & County of San Francisco,* 556 F.2d 450, 457 n. 13 (9th Cir. 1977); *Brown v. United States,* 755 F.Supp. 285 (N.D.Cal.1990). Therefore, although the *Lobue* decision may be offered for persuasive guidance it is not the final authority on the

issue. *Id.* This well-settled principle is also applicable in the instance of declaratory judgments declaring a statute unconstitutional. *Steffel v. Thompson,* 415 U.S. 452, 471, 94 S.Ct. 1209, 1222, 39 L.Ed.2d 505 (1974). Third, the Supreme Court has held that pending review in the Court of Appeals and in the Supreme Court, the Government is free to continue to apply a statute declared unconstitutional by a district court. *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 155, 83 S.Ct. 554, 560, 9 L.Ed.2d 644 (1963).

### (b) *Comparable to Other Law Enforcement Procedures*

■ The Government in this case, as in *Lobue,* argued that the Judicial and Executive Branches' relationship in the law enforcement context and their relationship in the extradition situation are comparable. Detainee's reliance on the *Lobue* Court's rejection of this comparison is tenuous. Specifically, the Court finds the Government's analogy of an extradition to both a search warrant or a preliminary examination to be compelling.

■ The division of functions between the Judicial and Executive Branches under § 3184 and in several well established criminal procedures are clearly similar. Particularly persuasive is the comparison to the separate, but interconnected roles the Judiciary and Executive have in the initial stages of a criminal prosecution based on a criminal complaint. Rule 5.1, of the Federal Rules of Criminal Procedure, provides in part, that at a Preliminary Examination hearing: "If from the evidence it appears that there is probable cause to believe that an offense has been committed and that the defendant committed it, the federal magistrate judge shall forthwith hold the defendant to answer in district court." A court's finding of probable cause then authorizes the detention and further criminal prosecution by the United States Attorney, a member of the Executive Branch. However, the prosecutor is not compelled to continue the prosecution effort and may dismiss the complaint for any number of reasons, including a legal and factual evaluation of either the evidence or the strength of the defendant's defense. A prosecutor applies his discretion based on any number of factors on whether to continue or halt the proceedings. In this criminal prosecution context the division of functions between the judge and the prosecutor is not a violation of constitutional separation of powers. No constitutional conflict arises because it is well recognized that although related, each step is a separate exercise of that branch's governmental responsibility.

The duties performed by the courts and the Department of State under the extradition procedures of § 3184 are analytically the same. Section 3184 states in part that if the court: "deems the evidence sufficient to sustain a charge under the provisions of the proper treaty or convention, he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue …". This provision sets out the division of roles and the process whereby an extradition is carried out. As illustrated in the criminal prosecution analogy above, no violation of constitutional principles exists; just as the two branches can have separate but related roles in the context of law enforcement they may be permitted to execute similar roles in matters of extradition without creating constitutional separation of powers problems.

### (c) *The Constitutional Separation of Powers Challenge*

The *Lobue* Court's holding that the extradition statute is unconstitutional based on a violation of the separation of powers principle is dubious. Notwithstanding the fact that the process by which extradition takes place involves independent determinations by both the Judicial and Executive Branches, this dual-branch procedure is pragmatically designed to deal with a federal issue that directly confronts both legal and foreign policy considerations.

In evaluating the separation of powers challenge detainee has made against the extradition statute the Court has examined both Supreme Court jurisprudence on the issue and the opinions of our Constitution's Framers. The analysis begins with Madison's views on federal government structure, as expressed in The Federalist No. 47. As

Madison explained, although separation of the government's power was an "essential precaution in favor of liberty" this "did not mean that these departments ought to have no *partial agency* in, or no *control* over the acts of each other." *The Federalist,* "The Federalist No. 47, pp. 312–315, (E. Earle ed. 1937) (emphasis in the original); *See Mistretta v. United States,* 488 U.S. 356, 381, 109 S.Ct. 647, 659, 102 L.Ed.2d 714 (1989). Madison and his brethren did not have an overriding fear of potential cooperative efforts among branches, but rather, the focus of their concern was on situations "where the *whole* power of one department is exercised by the same hands which possess the *whole* power of another department". *Mistretta,* 488 U.S. at 361, 109 S.Ct. at 659 (upholding a statute based on a separation of powers challenge; stating there is no violation of separation of powers where a statute provides for some degree of interconnection or commingling of power provided there is no danger of aggrandizement). Therefore, from its inception the application of the separation of powers doctrine has been recognized as requiring flexibility, accommodation and practicality.

The Supreme Court has consistently reaffirmed two central Madisonian principles of separation of power: first, that the separation of government power is essential to the preservation of democracy and our federal system of government, and second, Madison's concern that this separation not be absolute or defined by a clear line of demarcation. Conceptually, these principles may appear to be in conflict. On one hand there is the need for separation, on the other, the requirement for flexibility. However, in application these principles are complimentary. In *Mistretta,* the Supreme Court expressed the following contemporary view of these constitutional separation of powers principles:

> In a passage now commonplace in our cases, Justice Jackson summarized the pragmatic, flexible view of differentiated government power to which we are heir:
>
>> "While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches

separateness but interdependence, autonomy but reciprocity." *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 635, 72 S.Ct. 863, 870, 96 L.Ed. 1153 (1952) (concurring opinion).

In adopting this flexible understanding of separation of powers, we simply have recognized Madison's teachings that the greatest security against tyranny —the accumulation of excessive authority in a single Branch—lies not in a hermetic division among the Branches, but in a carefully crafted system of checked and balanced power within each branch.

*See also Morrison v. Olson,* 487 U.S. 654, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988); *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) (affirming a flexible approach to separation of powers). With this as background we now turn to the evaluation of 18 U.S.C. § 3184.

In the case of the extradition statute the merger of activities between the Judiciary and Executive in the extradition process involves exactly the integration of dispersed powers into a workable government contemplated by Madison and our founding fathers, and reaffirmed by Justice Jackson in *Youngstown Sheet & Tube.* The extradition process, set out in section 3184, has two distinct stages. The first stage in the extradition process requires a member of the Judicial Branch to make a determination, based on a judicial hearing, of extraditability. 18 U.S.C. § 3184. It is neither a final determination of guilt or innocence nor a final determination of our nation's treaty and foreign policy obligations. It is a preliminary jurisdictional and evidentiary finding. If the statutory, evidentiary and treaty requirements are met, a certification to that effect is made to the Executive Branch. 18 U.S.C. § 3184. This determination is based on the evaluation of traditional legal issues; including, jurisdiction, statutory/treaty interpretation and probable cause. If the judge certifies a detainee as extraditable the process proceeds to the second stage, an independent evaluation by the Department of State. In stage two the statute confers on the Executive Branch full discretion in making the final determination as to whether an individual

will be surrendered to the requesting foreign nation.

■ In *Nixon v. Administrator of General Services*, 433 U.S. 425, 443, 97 S.Ct. 2777, 2790, 53 L.Ed.2d 867 (1977), the Court set forth a framework for evaluating separation of powers challenges:

[I]n determining whether the Act disrupts the proper balance between the coordinate branches, the proper inquiry focuses on the extent to which it prevents the Executive Branch from accomplishing its constitutionally assigned functions. Only where the potential for disruption is present must we then determine whether the impact is justified by an overriding need to promote objectives within the constitutional authority of Congress.

*See also Mistretta*, 488 U.S. at 383, 109 S.Ct. at 660. Thus two separate elements must be evaluated: (1) whether the statutory provision prevents the accomplishment of constitutional functions and (2) if so, whether the disruptive impact is justified by any overriding constitutional need.

■ As applied in this case, this first inquiry looks at whether there is any prevention of the Judiciary's constitutional functions. When the alleged breach of separation of powers involves the Judicial Branch, this inquiry focuses on two types of conflicts: a) whether the tasks assigned are more appropriately assigned to another branch, *Mistretta*, 488 U.S. at 383, 109 S.Ct. at 660, *citing, Morrison*, 487 U.S. at 680–681, 108 S.Ct. at 2613–2614, or b) whether the provision impermissibly " 'threatens the institutional integrity of the Judicial Branch.' " *Mistretta*, 488 U.S. at 383, 109 S.Ct. at 660, *citing, Morrison*, 487 U.S. at 680–681, 108 S.Ct. at 2613–2614, *quoting, Commodity Futures Trading Commission v. Schor*, 478 U.S. 833, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986). Here section 3184, the extradition statute, survives both these inquiries. Under the challenged procedure there is no reasonable argument that another branch is better suited than the Judicial Branch to exercise the judicial functions of stage one or the Executive Branch to exercise the foreign policy judgments of stage two. *See infra* pp. 20–24. As well, despite this statute's admit-

ted and purposeful commingling of two branch's functions, this cooperation poses no real threat of encroachment to the Judiciary's power or institutional integrity.

Based on the Court's finding above, the second *Nixon* inquiry, whether the disruptive impact of a imbalance in government power is justified by any overriding constitutional need, is not required. However, assuming arguendo, that the potential for some intrusion on the Judiciary's power exists this impact is unquestionably justified by the need for the Executive Branch to command our nation's foreign affairs.

Additional support for the constitutionality of the extradition statute is found in examining its practical application. In terms of practical operation, the distinctive and constitutionally designed expertise of the Judicial and Executive Branches are appropriately utilized in the two step extradition process of section 3184. In the first stage, the extradition hearing, a judicial hearing is conducted by a federal judge. The judge confronts justiciable issues and questions of law; such as, probable cause, statutory interpretation and jurisdiction. This stage in the proceedings requires the straightforward application of Anglo–American legal principles and not any sophisticated foreign policy analysis. This is what the Judicial Branch of government is meant to do. In foreign affairs, we enter the judicial bailiwick when there is a specific dispute, and then only when principles of jurisprudence rather than principles of political policy are concerned. Courts cannot and should not enter the "political thicket" of international relations. Quite frankly, with few exceptions, the Judiciary is ill-equipped in terms of both training and experience to do so. The second stage, the independent review of the extraditability of the detainee by the Secretary of State, is broad-based. Albeit on a case-by-case basis this review may include many factors, it certainly affords the opportunity for the Executive Branch to consider the many possible political or foreign policy issues that may arise in an extradition.

Furthermore, the basic nature of foreign relations and diplomacy provides sound ratio-

nale for an independent Executive Branch review. It is the Executive Branch, not the Judiciary, that has the resources, expertise, knowledge and the mission to be informed and aware of the multiple facts and issues bearing upon our nation's foreign affairs. Therefore, it is pragmatic that many of the responsibilities concerned with foreign relations, including the decision to surrender a detainee under an extradition statute, fall to the purview of the Executive. *See generally* Plischke, *The Conduct of American Diplomacy,* p. 65 (1967). The final decision to extradite an individual is inarguably based, in substantial part, on considerations of our foreign affairs with the requesting nation. As the character of foreign policy decisions, is political, not judicial, they are better placed within the discretion of the Executive Branch. As stated by the Supreme Court:

> [t]he very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative. They are delicate, complex, and involve large elements of prophecy. They are and should be undertaken only by those directly responsible to the people whose welfare they advance and imperil. They are not decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and which has long been held to belong in the domain of political power not subject to judicial intrusion or inquiry. *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.,* 333 U.S. 103, 111 [68 S.Ct. 431, 436, 92 L.Ed. 568] (1948).

In sum, in designing the federal government's structure, Madison and our founding fathers realized that the separation of government power was essential. However, they also realized the practical need for cooperation and interdependence; the framers of our Republic did not design a government where the three branches must be entirely separate and distinct. *Mistretta,* 488 U.S. at 380, 109 S.Ct. at 659 *citing, Nixon,* 433 U.S. at 443, 97 S.Ct. at 2790 (rejecting as too rigid and outdated the view that the separation of the three branches of the federal government must be complete). This flexibility and interdependence is required. If the separation of powers were to be applied with the rigidity advanced by Detainee Lin our government would fail to operate. As expounded by Justice Holmes: "We must remember that the machinery of government would not work if it were not allowed a little play in its joints." *Bain Peanut Co. of Texas v. Pinson,* 282 U.S. 499, 501, 51 S.Ct. 228, 229, 75 L.Ed. 482 (1931).

The operation of this statutory procedure provides a practical solution to a complex problem with factual, legal, political and national foreign policy concerns. Thus, it is not only understandable that an extradition statute would require both judicial and executive roles, but, perforce must rely on it.

Accordingly, based on the foregoing, it is the opinion of this Court that the extradition statute is a constitutional blending of the powers of the Judiciary and Executive and not a violation of separation of powers. The extradition process is a flexible employment of the individual expertise inherent in each branch, providing a workable and constitutional solution to a complex problem.

### CERTIFICATION

The evidence in the record being sufficient to sustain the charges under the provisions of the extradition treaty, Mr. Lin's extradition is warranted under the applicable law. As to detainee's defense, this Court finds that the holding in *Lobue v. Christopher,* 893 F.Supp. 65 (D.D.C.1995), is not binding on this Court and that 18 U.S.C. § 3184, the extradition statute, is constitutional. Accordingly, the undersigned does hereby certify this matter, together with the evidence of record, to the Secretary of State that a warrant may issue upon the requisition of the proper authorities of the Republic of Palau, for surrender of Mr. Lin, according to the provisions of applicable law and the extradition treaty. Mr. Lin is hereby committed to the custody of the U.S. Marshal for this District until surrender is made.

IT IS SO ORDERED.