**In the Matter of the EXTRADITION OF Angela Christine POWELL.**

**Criminal No. 97MG2364.**

United States District Court,
S.D. California.

April 9, 1998.

Frank J. Ragen, III, Law Offices of Frank J. Ragen, San Diego, CA, Martha McNab Hall, DiIorio and Hall, San Diego, CA, for Angela Christine Powell.

---

**ORDER DENYING EXTRADITEE'S MOTION TO EXCLUDE EVIDENCE, MOTION FOR FRANKS HEARING, MOTION TO ALLOW EVIDENCE, MOTION FOR DISCOVERY AND DENYING THE USA'S MOTION TO DISALLOW EVIDENCE AND PREVIOUS MOTIONS**

PAPAS, United States Magistrate Judge.

*Statement of Facts:* [1]

On August 7, 1997, at approximately 10:10 p.m., Extraditee Angela Powell (hereafter "Powell") and a male companion, Andre Peart (hereafter "Peart") entered the U.S. from Mexico via San Ysidro. They were the sole occupants in a 1992 BMW belonging to Alfons Schreiber of Chula Vista, California. Peart was the driver and Powell was the sole passenger.

When the car reached the primary inspection area, Inspector Mynatt asked Peart for identification. When Peart was unable to produce identification, he was referred to the secondary inspection area. Once in the secondary area, Peart was asked to turn off the engine and give the keys to Mynatt. Instead of complying, Peart hesitated, punched the accelerator and reached for the gear shift lever. Mynatt removed Peart's hand from the gear shift lever and ordered Peart from the vehicle several times. During this incident, Peart reached towards his waistband. Once Peart was out of the car, he was patted down and a .25 caliber pistol was removed from his waistband. Peart became combative, broke away from inspectors, and attempted to flee. He was caught and handcuffed.

Powell was also removed from the car and handcuffed. Once inside the INS office, Powell started to complain of severe abdominal pains and told inspectors she thought she was having a miscarriage. Powell was taken to the hospital by paramedics.

At the hospital, Powell was able to walk normally from the gurney to the examination room. According to nurses at the hospital

---

[1]. Statement of Facts is derived from Exhibits A, B, and C attached to Powell's Motion in Opposition of Provisional Arrest, dated November 20, 1997. These exhibits include the Affidavit in Support of Provisional Arrest written by Special Agent Marquita Davis and excerpts from the Investigative Reports.

emergency room, Powell showed no signs of having a miscarriage when she arrived. Powell behaved in a nervous manner and several times asked if she could leave the hospital. Powell also asked the nurse at least five times whether she was under arrest and if the police were outside.

As the nurse helped Powell undress for the exam, she noticed Powell was wearing quite a bit of jewelry, including several neck chains, rings and very expensive looking pearl earrings. The dress Powell was wearing was a gold gown that, along with the jewelry, contrasted with the filthy underwear Powell was wearing.

After drawing blood from Powell and stepping out of the room, the nurse overheard Powell talking on the phone. According to the nurse, she heard Powell tell the other party to come and get her right away. Powell also told the other party that she had done something for which she could get life. When the nurse re-entered the room, Powell was sitting on the bed counting cash. Powell subsequently removed her own IV drip, dressed and quickly left the hospital.

On August 8, 1997, one day after the above scenario took place, INS contacted the stepson of Alfons Schreiber, the owner of the vehicle in which Peart and Powell were stopped the day before. After being advised of the situation, the stepson went to Schreiber's residence in Rosarito, Mexico and found the bodies of Schreiber and his wife, Blanca Magdalena de la Rosa. Schreiber was found dead on the floor with a belt around his neck, a plastic bag over his head, and his face crushed. A bloody dumbbell was found nearby. Schreiber's wife was found dead in another room, laying on the bed with a pillow over her face and several gunshot wounds to her head.

On August 9, 1997, investigators from Mexico accompanied U.S. investigators to an interview with Peart regarding the murders. Peart refused to speak with them. Also on this date, investigators spoke with Thomas Powell, a man who was identified as Powell's exhusband. Thomas Powell told investigators that he had spoken to Powell earlier that day when she came to visit their children. He described Powell as wearing new sandals

and a new dress, hair dyed black and cut very short. He also said Powell had a big roll of cash in her possession.

Thomas Powell also told investigators that Powell told him she had killed a guy in Mexico with her bare hands because he farted in her face. Powell indicated to Thomas Powell that the ATF was after her and had already been to the place in Escondido where she had previously stayed. Powell told him she had to get out of town. He told investigators that Powell had arranged to return the next day, August 10, 1997, to take their children shopping. However, on the morning of August 10, 1997, he called investigators and told them she had changed her mind and would not be coming.

Also on August 9, 1997, investigators spoke with Powell's mother, who told investigators that she felt Powell was in hiding because she had gotten involved with some bad company and was in "real trouble." Later in the day, Powell's mother contacted investigators and told them she had learned Powell was in fact hiding, and wanted to leave town, because the police wanted her to testify against Peart.

The next day, agents followed Powell's mother to a meeting with Powell at the North County Fair Mall in Escondido, California. When Powell arrived, agents took her into custody and transported her to the Escondido Police Station. At approximately 11:15 p.m., Powell was read her *Miranda* rights by Agent Johnson. Powell invoked her *Miranda* rights and stated she did not want to answer any questions. The following is an excerpt from the investigation report that details the agents' next step in the process:

**"Johnson explained to POWELL that later in the booking process she would be given Torres' telephone number, and that she could contact Torres after consulting with her attorney if she so desired.**

**Johnson told POWELL that investigators knew all about the murders in Rosarito, about POWELL and Peart taking the BMW and being detained by INS at the border. Johnson also told POW-**

ELL that investigators knew she had gone to Scripps Hospital and had been staying in various residences in San Diego County. Johnson told POWELL that given the fact she had witnessed a murder, friends or relatives of Peart might also be looking for her. Johnson told POWELL that an interview, with her lawyer present, could be set up very easily if she decided to talk to investigators. Johnson then told POWELL that if she changed her mind and decided to talk to investigators, she would have to initiate contact—that since she had requested a lawyer, investigators would not be asking her to answer anything but personal information for booking purposes.

Torres[2] then explained that investigators were planning to take the jewelry that POWELL had in her possession when she was arrested and show it to the victims's family. Torres explained that if the victim's identified any of the pieces of jewelry, POWELL would be implicated in the murders. Torres asked if POWELL still wanted to talk to an attorney before answering questions, and POWELL said she would answer questions.

She said she was concerned for the welfare of her children and asked if she cooperated, would the government protect them? This information was relayed to AUSA Wheat, who said every effort would be made to protect POWELL'S children. POWELL said she wasn't sure which questions she would answer, but that agents could go ahead and ask."

After Johnson and Torres explained the evidence to Powell, she decided she would allow the agents to interview her. In essence, she told them the following: Powell and Peart went to the Schreiber's home in Rosarito, Mexico and pretended they were having car trouble. They convinced the Schreibers to drive them around Rosarito until Peart ultimately pulled a gun and forced the Schreibers to return to their residence.

Once at the residence, Peart tortured Mr. Schreiber while Powell held Mrs. Schreiber at gunpoint in another room. At one point, Peart asked Powell to hand him a dumbbell, which she did. Powell left the room, but returned later and found Peart on top of Mr. Schreiber, choking him with a belt, while Mr. Schreiber's head was covered by a plastic bag. At Peart's request, Powell sat on Mr. Schreiber's legs to hold them still. Powell told agents that Mr. Schreiber's head had been caved in.

Once Mr. Schreiber was killed, Peart went into the next room and shot Mrs. Schreiber in the head, killing her. Powell and Peart then took money, jewelry, coins, credit cards and banking information from the residence. Powell and Peart left Rosarito in the Schreiber's BMW and were subsequently detained at the border crossing.

Powell told agents that, after leaving the hospital, she made contact with several friends, two of whom were "Gary" and "Donnie". She said she gave "Donnie" a bag of jewelry and some credit cards because she needed money to bail Peart out of jail. She gave "Gary" a very expensive gold and diamond tennis bracelet she had taken from the Schreibers. "Gary" and "Donnie" were both subsequently identified and contacted by investigators. Both confirmed Powell's story as it related to them. Property belonging to the Schreibers was recovered from both men.

"Donnie" also told investigators that Powell had told him Peart had been arrested earlier at the border for carrying a firearm and that they had murdered an elderly couple in Mexico, and stole property from them, including the couple's BMW.

The recovered property was later identified by the victims' children as belonging to the victims. Ballistics tests matched the casings from the scene in Rosarito to the gun carried by Peart. The gun was registered to Mr. Schreiber. Powell was subsequently arrested and held for extradition.

## DISCUSSION

Powell makes four motions: 1) Motion to Exclude Evidence, 2) Motion for Franks

---

**2.** Agent Torres was another agent investigating the activities of Powell and Peart.

Hearing, 3), Motion to Allow Evidence and 4) Motion for Discovery.[3] Each is discussed separately below.

### POWELL'S Motion to Exclude Evidence

The first motion raised by Powell is entitled "Motion to Exclude Evidence." While not directly raised by Powell, her motion raises the Constitutional issue of whether *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (hereafter *"Miranda"*) and its required warnings are applicable in the context of an extradition proceeding. If *Miranda* does apply, then the court must decide whether certain statements obtained while Powell was in custody, and all evidence obtained as a result of those statements, must be suppressed.

### Is *Miranda* applicable to extradition hearings?

Powell takes no position regarding the applicability of *Miranda* to extradition hearings, but merely assumes it applies and argues *Miranda* was violated by the custodial officers. According to Powell's Motion, at pp. 4–6, Powell, upon being read her rights under *Miranda,* stated she did not want to answer any questions and asked for a lawyer. Agents then explained to Powell the evidence they had and how they would use it against her. After this explanation, Powell was again asked if she wanted to speak with an attorney.

In her motion, Powell cites a litany of cases dealing with the applicability of *Miranda* to criminal cases adjudicated in the United States. (See Powell's Motion, at pp. 3–8.) Powell offers no authority for the proposition that *Miranda* applies in the venue of a non-criminal extradition proceeding other than references to *U.S. v. Kin–Hong,* 110 F.3d 103, 120 (1st Cir.1997), *reh'g en banc den'd, Lui v. U.S.,* — U.S. —, 117 S.Ct. 1491, 137 L.Ed.2d 816 (1997), and *Esposito v. Adams,* 700 F.Supp. 1470, 1479, n. 9 (N.D.Ill., 1988).

Powell contends that because her confession was obtained as a result of a violation of *Miranda,* it was involuntary and must be excluded along with all of the other informa-

tion she gave to the agents interrogating her. [Powell's Motion, at pp. 7–8, citing to *Townsend v. Sain,* 372 U.S. 293, 307, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), *United States v. Tingle,* 658 F.2d 1332, 1335 (9th Cir.1981), *Hutto v. Ross,* 429 U.S. 28, 30, 97 S.Ct. 202, 50 L.Ed.2d 194 (1976), and *U.S. v. Bautista–Avila,* 6 F.3d 1360, 1364 (9th Cir.1993)].

In summary, Powell claims:

1. All statements made by her should be suppressed;

2. All evidence obtained as a result of her statements must be excluded under "fruits of the poisonous tree" doctrine;

3. The affidavits used to obtain the warrants must be excluded because they were based on the above allegedly illegally obtained evidence; and,

4. There is now insufficient evidence on which to extradite her.

The Republic of Mexico's (hereafter the "government") position is naturally contrary to Powell's. The government asserts *Miranda* itself limits "Miranda warnings" to "criminal defendants in U.S. courts" and that Miranda dealt with issues of "American criminal jurisprudence" and was concerned with "the protection of rights at trial." (See Opposition Response, at pp. 6–7.) Thus, the government argues, since extradition proceedings are not criminal in nature, and are controlled by 18 U.S.C. § 3184 and § 3190, *Miranda* does not apply. (*Ibid.*) Also, since *Miranda* is not applicable to extradition proceedings, the exclusionary rule is also inapplicable.

In summary, the government asserts the following;

1. *Miranda* is not applicable to extradition proceedings,

2. A *Miranda* hearing would violate the U.S/Mexico Extradition Treaty,

3. 18 U.S.C. § 3184 does not authorize *Miranda* Hearings,

4. 18 U.S.C. § 3190 governs the admissibility of statements in extradition proceedings, and

---

**3.** Powell raises sub-issues beyond those identified in the motion filed with the court. These sub- issues are incorporated into this ruling as part of the analysis of the main points.

5. The exclusionary rule is inapplicable to extradition proceedings because it would punish foreign countries for the actions of U.S. agents.

*Analysis:*

■ The well established general rule is that an extradition hearing is not a criminal proceeding, and the person whose return is sought is not entitled to the rights available in a criminal trial at common law. *Extradition of Garcia*, 890 F.Supp. 914, 923 (S.D.Cal. 1994). (Citations omitted) A Magistrate Judge's function is to determine whether there is "any" evidence establishing reasonable or probable cause. *Ibid.* Pursuant to 18 U.S.C. § 3184, a Magistrate Judge has no discretion whether to extradite: if the Magistrate Judge "deems the evidence sufficient to sustain the charge," then the magistrate "shall" certify for extradition. *Lopez–Smith v. Hood*, 121 F.3d 1322, 1327 (9th Cir.1997). 18 U.S.C. § 3190 provides that items offered into evidence "shall be received and admitted as evidence... if they shall be properly and legally authenticated" by the requesting country. *Oen–Yin Choy v. Robinson*, 858 F.2d 1400, 1407 (9th Cir.1988) (No error for District Court to refuse to consider admissibility of evidence when it has been properly authenticated.).

■ Also, The Fifth Amendment states, in pertinent part, "No person ... shall be compelled *in any criminal case* to be a witness against himself." (emphasis added) The Courts have interpreted the language of this clause "as written," meaning that the Fifth Amendment privilege against self-incrimination pertains only to criminal cases. *Esposito v. Adams*, 700 F.Supp. 1470, 1478 (N.D.Ill.1988). The Fifth Amendment has been compared to the Sixth Amendment guarantee of a speedy trial, which has been held inapplicable to an extradition proceeding because it applies only to "criminal prosecutions", and an extradition proceeding is not a "criminal prosecution." (*Ibid.*, citing to *Jhirad v. Ferrandina*, 536 F.2d 478, 485 n. 9 (2d Cir.), *cert. denied*, 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976)). Similarly, the Fifth Amendment guarantee against double jeopardy does not apply to extradition for the same reasons. *Collins v. Loisel*, 262 U.S.

426, 429, 43 S.Ct. 618, 619, 67 L.Ed. 1062 (1923).

However, the Fourth Amendment and the Due Process Clause of the Fifth Amendment have been applied to extradition hearings in the limited context of arrest and detention without bail. *Lopez–Smith v. Hood*, 121 F.3d 1322, 1326 (9th Cir.1997), citing *Parretti v. United States*, 122 F.3d 758, 770 (rehearing en banc granted, 124 F.3d 1186 (9th Cir.1997)).

■ The great weight of the authority cited above indicates that *Miranda* does not apply to extradition proceedings. The Ninth Circuit spoke very clearly in *Oen Yin–Choy* when it said "authentication is the only requirement for admissibility of evidence under general United States extradition law." *Oen Yin–Choy*, 858 F.2d at 1407. Any claim as to the admissibility of evidence should be heard in the court of jurisdiction. In this case, assuming extradition, the court of jurisdiction is in Mexico.

However, Powell argues *Miranda* does apply and supports her contention by citing to *Esposito v. Adams*, supra, and *U.S v. Kin–Hong*, supra. Powell relies on hypothetical conjecture found in *Esposito* at footnote 9, which states in pertinent part:

> Even if the court found an abuse had taken place, the correct remedy would be suppression of the "fruits" ... Courts have been reluctant to impose such sanctions on the basis that illegal conduct of (U.S.agents) should not penalize the requesting country ... and sanctions against the (U.S.agents) would not serve a deterrent effect.

The *Esposito* court rejected Powell's argument that the Fifth Amendment should apply to extradition proceedings by interpreting "the language of the self-incrimination clause as written," meaning that it applies only in "any criminal case." *Esposito*, at 1479. However, the court hypothesized as to the result if the Fifth Amendment did apply. *Ibid.* The court determined there was no *Miranda* violation, but if there was, the only result would be suppression of the "fruits" which, in that case, still left sufficient proba-

ble cause to extradite. *Ibid.* (*Esposito, supra*, at footnote 9; emphasis added.)

The *Kin–Hong* court stated that a probable cause standard necessarily requires a determination that the evidence is both sufficiently reliable and of sufficient weight to warrant the conclusion that probable cause exists. *Kin–Hong*, at 121. The court stated:

> "For example, a confession obtained by duress is inherently unreliable and would be given little weight even if the confession were authenticated. (citations omitted) The reliability of the evidence is a factor for the reviewing court to consider as well, and potentially unreliable evidence may be accorded reduced weight by the court." *Kin–Hong*, at 121.

The government correctly states in its response that the court's according weight to evidence is not the same as making a determination of whether *Miranda* applies to extradition proceedings. (Response, at 10.) The *Kin–Hong* court, in fact, reaffirms the applicability of 18 U.S.C. § 3190 in governing the admissibility of evidence in extradition proceedings. *Kin–Hong* at 120. Therefore, neither *Kin–Hong* or *Esposito* supports Powell's position that *Miranda* applies to extradition proceedings.

 In fact, if it is determined that Powell's statements are unreliable because they were involuntary, an analysis under *Kin–Hong* could arguably rebuild reliability into Powell's statements. Under *Kin–Hong*, the Magistrate Judge can determine the weight that Powell's statements should be given in assessing probable cause.

Under the facts of the present case, Powell told agents she contacted two men, "Gary" and "Donnie", told them she was wanted, and gave them some of the victims' property. Agents were able to contact the two men, who independently confirmed Powell's statements and turned the victims' property over to the agents. This corroboration may serve to rehabilitate Powell's statements under the circumstances of an extradition hearing. The court may then accord them the appropriate weight.

However, assuming arguendo *Miranda* does apply to extradition proceedings, the next step would be to determine if there was a violation of Powell's *Miranda* rights. Powell contends that the confession and statements were obtained through the use of improper influence and psychological pressure. Thus, the statements were involuntary and unreliable. (Powell's Motion, at 7, citing to *Townsend v. Sain*, 372 U.S. 293, 307, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); *U.S. v. Tingle*, 658 F.2d 1332, 1335 (9th Cir.1981)). An excerpt from the police report on the interrogation of Powell after she invoked her rights and asked for a lawyer provides the facts for the court's analysis [4]:

> Johnson explained to POWELL that later in the booking process she would be given Torres' telephone number, and that she could contact Torres after consulting with her attorney if she so desired.
>
> Johnson told POWELL that investigators knew all about the murders in Rosarito, about POWELL and Peart taking the BMW and being detained by INS at the border. Johnson also told POWELL that investigators knew she had gone to Scripps Hospital and had been staying in various residences in San Diego County. Johnson told POWELL that given the fact she had witnessed a murder, friends or relatives of Peart might also be looking for her. Johnson told POWELL that an interview, with her lawyer present, could be set up very easily if she decided to talk to investigators. Johnson then told POWELL that if she changed her mind and decided to talk to investigators, she would have to initiate contact—that since she had requested a lawyer, investigators would not be asking her to answer anything but personal information for booking purposes.
>
> Torres then explained that investigators were planning to take the jewelry that POWELL had in her possession when she was arrested and show it to the victims' family. Torres explained that if the victims [family] identified any of the pieces of jewelry, POWELL would be

---

4. This same excerpt is contained in the State- ment of Facts at the beginning of this ruling.

implicated in the murders. Torres asked if POWELL still wanted to talk to an attorney before answering questions, and POWELL said she would answer questions.

She said she was concerned for the welfare of her children and asked if she cooperated, would the government protect them? This information was relayed to AUSA Wheat, who said every effort would be made to protect POWELL'S children. POWELL said she wasn't sure which questions she would answer, but that agents could go ahead and ask.

One may conclude from the above quoted excerpt that agents explained to Powell at great length the evidence they had discovered against her, in an attempt to elicit information without regard for the invocation of her *Miranda* rights. In addition, statements by Agent Johnson to the effect that friends of Peart might be looking for her could be construed as psychological pressure applied to overcome her prior invocation. Further, Agent Torres' "readmonishment" after the explanation of the evidence may be inappropriate under *Smith v. Illinois*, 469 U.S. 91, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984) and *United States v. Womack*, 542 F.2d 1047 (9th Cir.1976). This court does not conclude that *Miranda* was violated. But, assuming arguendo there was a violation of *Miranda*, any statements elicited from Powell and any evidence obtained as a result of her statements would logically have to be excluded.

■ Powell contends that, as a result of the alleged *Miranda* violation and the resulting exclusion of evidence, the affidavits filed by Agent Davis (one on October 2, 1997 in support for Complaint for Provisional Arrest and one on November 25, 1997 in support for Mexico's Application for Extradition) now fail to provide probable cause to proceed. Thus, the next step would be to determine what evidence, if any, should be excluded, and if the remaining evidence is insufficient such that a hearing to determine extradition would be unnecessary.

In reviewing the government's Response of November 20, 1997, at pp. 8–10, and Agent Davis' affidavit from October 2, 1997, the following is a compilation of evidence available after excluding those statements and the evidence obtained in alleged violation of *Miranda:*

1. Powell was the sole passenger in a BMW driven by Peart as that car entered the United States at the San Ysidro Port of Entry.

2. The BMW belonged to one of the murder victims found dead in Rosarito, Mexico.

3. When confronted by agents at the border, Peart attempted to flee twice, once by punching the car accelerator and once on foot.

4. Peart was observed reaching for his waistband while struggling with agents.

5. Peart, the driver, had a .25 caliber pistol concealed in his waistband when arrested at the border.

6. Ballistics tests indicated the .25 caliber pistol was used in the murders.

7. The pistol belonged to one of the murder victims.

8. When Powell was detained along with Peart, she complained of abdominal pains and indicated she thought she was having a miscarriage.

9. Once at the hospital, a nurse found Powell's behavior inconsistent with having a miscarriage.

10. Powell repeatedly asked the nurse if she was under arrest and if the police were waiting outside.

11. Powell was wearing jewelry that included expensive looking earrings and a gold gown, both of which contrasted with the dirty underwear she was wearing.

12. A nurse observed Powell sitting on the bed counting a large amount of cash.

13. A nurse overheard Powell telling someone on the phone she could get life for what she had done.

14. Powell removed her own IV and fled the hospital without being examined by a doctor.

15. Powell's ex-husband told investigators that Powell had told him she had killed a guy

in Mexico with her bare hands for farting in her face, and that she had to get out of town because the police were looking for her.

16. Powell's mother told investigators that she learned Powell was in hiding because the police were looking for her, and that she wanted to leave town.

17. When arrested, Powell was wearing jewelry later identified by the children of the murder victims as belonging to the victims.

Evidence that may be excludable includes all of Powell's statements after she invoked her *Miranda* rights, as well as any evidence discovered as a result of contact with "Donnie" and "Gary." This includes statements made by "Donnie" and "Gary" corroborating Powell's statements to investigators, as well as jewelry recovered from both "Donnie" and "Gary."

Is the remaining evidence so exculpatory or inconclusive such that an extradition hearing not be held to determine if probable cause exists to extradite Powell for the murders of Alfons Schreiber and his wife, Blanca Magdelena de la Rosa? Assuming arguendo *Miranda* applies to extradition hearings, and assuming there was a violation in the present case, and assuming evidence would be excluded, the court concludes there is still enough available evidence to warrant an extradition hearing.

▮ Ultimately, however, the weight of the authority indicates that *Miranda* does not apply to a non-criminal extradition hearing. Thus, the court makes the following conclusions and rulings regarding Powell's Motions: All motions concerning *Miranda* and its effects are DENIED.

1. Powell's statements are not suppressed;

2. Fruits of the Poisonous Tree doctrine does not apply and evidence obtained as a result of Powell's statements will not be excluded;

3. Since *Miranda* does not apply in extradition proceedings, the affidavits using information obtained through Powell's statements will be used by the court to establish whether probable cause exists;

4. There is no requirement to conduct a *Miranda* hearing to determine whether *Miranda* was violated and, if so, what, if any, evidence should be excluded.

***Powell's Motion Attacking the Sufficiency of the Affidavits, Incorporating previous Motion for Franks Hearing.***

### 1. Is Agent Davis' Affidavit sufficient?

Powell contends that the affidavits supplied by Agent Davis are conclusory and insufficient to establish probable cause.

Powell contends the affidavits

"do not state that the allegations contained therein are from personal knowledge, but rather contain numerous conclusory statements relating little or no basis for declarant's belief. The statements also lack circumstances from which Agent Davis purportedly determined that her sources were reliable and credible." (Powell's Motion, at p. 10).

Powell cites to various cases that offer examples of conclusory statements, but offers no proof in the present case other than broad, unsubstantiated allegations. Without more, the court would have to again review the affidavits it previously reviewed to issue the warrant.

However, working under the assumption that the affidavit in question is the one attached to the previous motion filed by Powell on November 20, 1997, it appears that the affidavit is more than sufficient. In fact, the government correctly responds to Powell's argument as follows:

"[T]he government did exactly what the Ninth Circuit recommended and submitted a detailed affidavit to support the warrant for Extraditee's Provisional arrest.

Furthermore, paragraph 2 of the affidavit reads as follows: 'This affidavit is based on my personal observations as well as information provided to me by officers and agents of the United State's Immigration and Naturalization Service ("INS"), the United States Custom's Service, the Bureau of Alcohol, Tobacco, and Firearms, the California Department of Corrections, the San Diego Sheriff's Department and

the Escondido Police Department.'" (Government's Response at p. 12)

Agent Davis' affidavit indicates the sources of her information, i.e., personal knowledge and information from other agents and officers. Davis also clearly explains the essential facts, which provide an adequate basis for the Magistrate Judge to independently determine the presence of probable cause. However, this issue may have been prematurely brought by Powell. There is yet no tender of evidence from the Republic of Mexico from which the court can determine whether there is sufficient competent evidence to extradite. Therefore, this aspect of the motion is DENIED as moot.

**2. Is a *Franks* Hearing appropriate under the facts of the present case? [5]**

Powell argues that a *Franks* hearing is required to determine whether there was probable cause to arrest her because the affidavit to the provisional arrest warrant contains material omissions.

The government counters with the argument that a *Franks* hearing is applicable only to criminal defendants and is not authorized by 18 U.S.C. § 3184.

**a. Does this court have the authority to conduct a Franks hearing?**

▮▮▮▮ Powell does not address this court's authority to hold a *Franks* hearing in the context of an extradition proceeding. Powell does cite to *Parretti v. U.S.*, 122 F.3d 758 (9th Cir.1997), *rehearing en banc granted*, 124 F.3d 1186 (9th Cir.1997), which held that an arrest pursuant to a foreign warrant is still subject to scrutiny under the Fourth Amendment. However, she merely concludes, without support, that she is entitled to a *Franks* hearing and this court should handle it. She is wrong on both counts.

Powell is asking this court to conduct a *Franks* Hearing on the affidavit supporting the warrant for provisional arrest that was originally signed by this court. It does not appear to make sense to have this court examine its previous decision when Powell is

alleging that this court was misled in issuing the warrant.

When a *criminal defendant* requests a *Franks* Hearing to challenge a Magistrate Judge's issuance of an arrest warrant, a "reviewing court" conducts the *Franks* Hearing. *Franks v. Delaware*, 438 U.S. 154, 171, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Powell also impliedly relies on *Parretti* for the proposition that this court should decide whether she is entitled to a *Franks* hearing. However, even in *Parretti*, the warrant for provisional arrest issued by a Magistrate Judge was reviewed by the district court on a petition for habeas corpus. *Parretti* at 761. Therefore, it does not appear that Powell has brought this issue to the proper court. Consequently, the court concludes that it does not have the authority to conduct a *Franks* hearing.

**b. Even if this court has the authority to hold a Franks Hearing, Powell has not demonstrated she is entitled to one.**

In *Franks*, the Supreme Court resolved whether a *criminal defendant* has the right to challenge the truthfulness of factual statements made in an affidavit. *Franks*, 438 U.S. at 155, 98 S.Ct. 2674. (emphasis added) This court has already found that an extraditee is not entitled to the same rights as a defendant in a criminal proceeding. See *In re Extradition of Garcia*, 890 F.Supp. 914, 922 (S.D.Cal.1994).

Powell argues that since *Parretti* held a provisional arrest warrant is subject to Fourth Amendment scrutiny, then case law supports her right to a *Franks* Hearing. Powell cites to *U.S. v. Stanert*, 762 F.2d 775, 781 (9th Cir.1985), which held the Fourth Amendment mandates that a criminal defendant be permitted to challenge an affidavit for a warrant when it contains deliberate or reckless omissions of facts that tend to mislead. Powell also cites to *U.S. v. Whitworth*, 856 F.2d 1268, 1280 (9th Cir.1988) (quoting *Stanert*) and *U.S. v. Dozier*, 844 F.2d 701, 705 (9th Cir.1988), which generally stand for the same proposition, but are more directed to the standard required of a "criminal defen-

---

**5.** This part of Powell's motion is incorporated with the court's permission, from a previous mo-

tion filed by Powell on November 20, 1997.

dant" (emphasis added) seeking a *Franks* Hearing.

**c. Even if it were determined that (1) this court had authority to grant a Franks Hearing, and (2) Powell had shown her entitlement to a Franks Hearing as an extraditee, Powell has still failed to show that she should be afforded a Franks Hearing on the merits.**

 Powell contends that the affidavit for the provisional arrest warrant contains some serious omissions that, had they been included in the affidavit, would have cast doubt on the existence of probable cause. Powell argues that the affidavit fails to mention the unreliability of statements made by Powell herself. Powell contends that, since the probable cause to believe she committed the murders in Mexico is based on her own statements to agents and others, any indication that she is unreliable should have been included in the affidavit. For example, Powell told her ex-husband that she killed someone (in Mexico) because he farted in her face. The agents found this statement to be ridiculous, yet they reported that Powell said "she had killed a guy while in Mexico."

Powell also takes issue with the fact that, prior to making a statement to ATF agents, she was told by the agents she was needed as a witness against Peart, that her life could be in danger from Peart, and the U.S. Government would protect her if she agreed to be a witness.

 However, the government correctly argues that Powell has failed to meet her burden showing entitlement to a *Franks* Hearing. In order to be entitled to a hearing concerning omissions in an affidavit for an arrest warrant, a criminal defendant must make a substantial preliminary showing that (1) material facts were deliberately or recklessly excluded from the affidavit; and (2) the excluded information was necessary to the Magistrate Judge's findings of probable cause. *Franks,* 438 U.S. at 171–172, 98 S.Ct. 2674.

Here, Powell failed to offer any proof whatsoever that the omissions in the affidavit were made deliberately or recklessly. Rath-

er, Powell's allegations are simply complaints about what witnesses were told when those witnesses' statements were taken, or when they were interviewed by the agents. This does not amount to deliberate or reckless exclusion of facts from the affidavit.

The government cites *U.S. v. Garcia–Cruz,* 978 F.2d 537, 540 (9th Cir.1992), superseded on other grounds 40 F.3d 986 (9th Cir.1994), which holds that failure to include facts in an affidavit that tends to undermine the credibility of a witness (in that case, an informant), even if negligent, does not, without more, satisfy the state of mind requirement in *Franks.* Moreover, the government lists, at pages 8–10 of its Opposition of November 20, 1997, facts in the affidavit that give rise to probable cause even if the contested information did not exist.[6]

**Subordinate Issues:**

 Powell raises two other issues subordinate to her claim of insufficient evidence raised above. First, Powell asks the court to apply a level of probable cause higher than that needed for an arrest warrant. Presumably, Powell is asking the court to look at the evidence needed to **extradite** at a higher level, i.e., that needed to justify committal to trial, not the lesser standard applied to warrants. (Powell's Motion, pp. 12–14.)

The government contends the court should deny Powell's motion because this court has already identified the proper standard in *Matter of Extradition of Garcia,* 890 F.Supp. 914 (S.D.Cal.1994). In *Garcia,* this court stated the appropriate level of probable cause to extradite is "whether there is competent evidence to justify holding the respondent for trial, not whether the evidence is sufficient to justify conviction." *Garcia, supra,* at 923, citing to *Collins v. Loisel,* 259 U.S. 309, 42 S.Ct. 469, 66 L.Ed. 956 (1922).

On this issue, it appears the parties are in agreement as to the correct standard. Each, however, has stated it in different terms. Regardless, this court will use the standard it articulated in *Garcia.*

Second, Powell also makes the broad allegation that "all of the evidence which pro-

---

6. See pp. 953–54 of this Order.

vides the basis for Mexico's Request for Extradition and the Complaint for Provisional Arrest were derived from unreliable hearsay" which cannot satisfy the standard of probable cause necessary to support extradition. [Powell's Motion, at pp. 14–15, citing to *Ex parte Fudera*, 162 F. 591 (S.D.N.Y.1908).] Powell makes no offer of proof to substantiate her claim that "all of the evidence" is based on unreliable hearsay. The government, on the other hand, asserts that hearsay is admissible, but does not address whether "unreliable" hearsay is admissible. (See Opposition, p. 14.)

In *U.S. v. Kin–Hong, supra,* the court enunciated the standard to be used in an extradition hearing:

[T]he evidence taken need not meet the standards for admissibility at trial.

Indeed, at a preliminary hearing in federal court a 'finding of probable cause may be based upon hearsay in whole or in part.' This is because a 'preliminary hearing is not a minitrial of the issue of guilt,'; rather, 'its function is the more limited one of determining whether probable cause exists to hold the accused for trial.' ... An extradition hearing similarly involves a preliminary examination of the evidence and is not a trial. An extradition hearing does not require a higher standard of evidence than a probable cause hearing. The special and limited nature of extradition hearings is manifested in a more lenient standard for the admissibility of evidence. Neither the Federal Rules of Criminal Procedure, see Fed.R.Crim.P. 54(b)(5), nor the Federal Rules of Evidence, see Fed. R.Evid. 1101(d)(3), apply to extradition hearings. The evidence may consist of hearsay, even entirely of hearsay." *Kin–Hong* at 120 (citations omitted).

The *Kin–Hong* court also noted that a probable cause standard necessarily requires a determination that the evidence is both sufficiently reliable and of sufficient weight, and that the reliability of the evidence is a factor for the reviewing court to consider and may be accorded reduced weight. *Kin–Hong,* at 121.

As stated earlier in a previous issue, this motion may be premature. The Republic of Mexico has not made an offer of evidence from which the court can make a determination of reliability. This motion must therefore be denied as moot.

### Powell's Motion to Allow Evidence

Powell requests an evidentiary hearing to rebut any inference of probable cause to extradite by (1) introducing evidence that shows the witnesses are unreliable, and (2) introducing evidence and raising certain affirmative defenses. (See Powell's Motion, pp. 15–17, citing *Hooker v. Klein,* 573 F.2d 1360, 1369 (9th Cir.), cert. denied, 439 U.S. 932, 99 S.Ct. 323, 58 L.Ed.2d 327 (1978), *Collins v. Loisel,* 259 U.S. 309, 316, 42 S.Ct. 469, 66 L.Ed. 956 (1922), *Parretti, supra,* at 1376, citing *Charlton; Matter of Extradition of Lahoria,* 932 F.Supp. 802, 803; *Matter of Extradition of Kulekowskis,* 881 F.Supp. 1126 (N.D.Ill.1995); *Matter of Extradition of Lin,* 915 F.Supp. 206 (D.Guam 1995); 18 U.S.C. section 1384.)

**1. Should Powell be allowed to present evidence that shows witnesses are unreliable?**

Powell's contention that she should be entitled to present evidence of unreliable witnesses seems to rest on her belief that the facts of her case present an exception to the general rule regarding the admissibility of evidence in an extradition proceeding. Powell argues that, because the U.S. (the "requested" party) and not Mexico (the "requesting" party) was responsible for collecting the majority of the evidence to be used against her, she has a right to contradict, not merely explain.

The government's position is that section 3, Article 13 of the Treaty between the United States and Mexico, "authorizes the competent legal authorities of the United States 'to employ all legal means within their power to obtain from judicial authorities the decisions necessary for the resolution of the request for extradition.'" (See Opposition, p. 14.)

The rules regarding the admissibility of evidence in an extradition hearing were stated by this court in *Matter of Garcia:*

Evidence that conflicts with that submitted on behalf of the demanding party is not

permitted, nor is impeachment of the credibility of the demanding country's witnesses. Also, extradition treaties do not contemplate the introduction of testimony of live witnesses by the respondent to contradict the demanding country's proof.

Explanatory evidence is allowed only if the evidence would, clearly, negate a showing of probable cause. Thus, it has been held appropriate to permit evidence that tends to obliterate probable cause but not evidence which merely contradicts the same. The Magistrate Judge conducting the extradition proceeding has wide latitude in admitting evidence.

Hearsay evidence is admissible on behalf of the respondent to establish the "obliteration" of probable cause. *Matter of Garcia* 890 F.Supp. at 923–924. (citations omitted.)

■ The purpose behind such broad evidentiary rules is to save the requesting country from having to send its citizens abroad to testify in a pre-trial trial. (See *Garcia, supra,* fn. 12.)

Powell does not argue that this rule is inaccurate. She appears to argue for an exception. However, it is of no matter that the U.S. (or its agents) gathered the evidence. Mexico is still the "requesting" country. Thus, Powell is foreclosed from presenting evidence as to the unreliability of the witnesses because the effect is the same: to change an extradition hearing into more than it is meant to be, i.e., a minitrial.

This motion is denied because it is inappropriate to present evidence contradicting that proffered by the Republic of Mexico. Also, as previously stated, until Mexico offers evidence, reliability cannot be determined.

**2. Should Powell be allowed to present evidence of a duress defense to negate the wilful requirement in the treaty?**

The Treaty between Mexico and the United States, states in pertinent part:

Article II, paragraph 1:

**"Extradition shall take place, subject to this treaty, for *wilful* acts which fall within any of the classes of the appendix ..."**

Article II, paragraph 3:

**"Extradition shall also be granted for *wilful* acts which, although not being included in the Appendix, are punishable ..."** (emphasis added).

■ Powell wants to assert the defense of duress, whereby she claims that she was forced by Peart to sit on the victim's legs to immobilize him. Powell claims this "duress" negates the "wilful" requirement of the Treaty between Mexico and the United States, thus negating the dual criminality required by the Treaty.

The government contends that an extraditee may not introduce evidence to establish a defense in an effort to defeat extradition because this would contravene the intent and meaning of extradition treaties by turning the proceedings into trials. [See Government's Response, at pp. 14–15, citing to *Hooker v. Klein,* 573 F.2d 1360, 1368 (9th Cir., 1978), *cert. denied,* 439 U.S. 932, 99 S.Ct. 323, 58 L.Ed.2d 327 (1978); *Hu–Yau–Leung v. Soscia,* 649 F.2d 914, 917 (2d Cir. 1981), *cert. denied,* 454 U.S. 971, 102 S.Ct. 519, 70 L.Ed.2d 389 (1981); *Lopez–Smith v. Hood,* 121 F.3d 1322, 1325 (9th Cir.1997); *Collins v. Loisel,* 259 U.S. 309, 316, 42 S.Ct. 469, 66 L.Ed. 956 (1922) ].

The government also contends that the dual criminality requirement is met because Powell is charged with an offense that is listed in the appendix and is punishable by more than a year in prison in accordance with the terms of section 1 of Article 2. Also, section 4 of Article 2 provides that "Subject to the conditions established in paragraph 1, 2 and 3, extradition shall also be granted: For ... the participation in the execution of an offense."

■ It is well settled that defenses are irrelevant to extradition hearings and should therefore not be considered. *Charlton v. Kelly,* 229 U.S. 447, 462, 33 S.Ct. 945, 57 L.Ed. 1274 (1913); *Collins v. Loisel,* 259 U.S. 309, 42 S.Ct. 469, 66 L.Ed. 956 (1922); *Hooker v. Klein,* 573 F.2d 1360, 1368 (1978). In Charlton, the court examined a Magistrate Judge's decision to exclude evidence of an insanity defense. The Court stated:

If the evidence was only for the purpose of showing present insanity by reason of which the accused was not capable of defending the charge of crime, it is an objection which should be taken before or at the time of his trial for the crime, and heard by the court having jurisdiction of the crime. If it was offered to show insanity at the time of the commission of the crime, it was obviously a defense which should be heard at the time of trial, or by a preliminary hearing in the jurisdiction of the crime, if so provided for by its laws. *Charlton, supra,* 229 U.S. at 462, 33 S.Ct. 945.

If the court analogizes the defense of duress to the insanity defense in *Charlton,* it comes to the a similar conclusion. Powell should be foreclosed from raising the defense of duress in the extradition hearing, as the defense is more appropriately offered before the court of jurisdiction.

Powell's argument relies on the interpretation of a term in the Treaty itself, i.e., "wilful." Powell contends that, because she was forced to participate in the murders, her actions were not "wilful" and, thus, did not fall under the requirements of the Treaty. Powell fails to provide a definition of "wilful" that the Court can turn to, but alludes to a meaning of volition: acting under one's own will. This definition is valid in some contexts of the law, but there are other appropriate meanings as well.

■ Treaty obligations should be liberally construed in favor of equality and reciprocity between contracting countries, and if the treaty fairly admits of two constructions, that interpretation enlarging rather than restricting rights claimed thereunder should be preferred. *Factor v. Laubenheimer,* 290 U.S. 276, 294–295, 54 S.Ct. 191, 78 L.Ed. 315 (1933) (citations omitted).

There are several reasonable interpretations of "wilful," all of which can reasonably be applied to Powell's alleged actions and involvement in the murders. The Random House College Dictionary defines "wilful" as "deliberate, voluntary or intentional." Here, three words with different meanings are used to interpret "wilful." However, "voluntary" seems to best fit the description offered by Powell. By claiming her actions were not "voluntary," Powell claims that they were not "wilful" under the terms of the Treaty.

"Deliberate" refers to something not happening by chance and is applied to what is done not hastily, but with full realization of what one is doing. (Random House Dictionary, revised edition, p. 351.) "Intentionally" is defined as "done deliberately or on purpose." (Random House Dictionary, revised edition, p. 693.)

In the present case, the Court could reasonably conclude that duress would not negate "wilful" as it applies to "intent" or "deliberation." Under that analysis, Powell knew what the results of her actions would be and intended, by her actions, that those results be reached. Powell's allegation of duress is based, in part, on Mexico's request for extradition which "cites evidence that Mrs. Powell was 'forced' to seat [sic] on the victim's legs to immobile him." (See Powell's Motion, p. 17.)

Powell's actions and inactions are inconsistent with her claim that she acted under duress, thus negating the "wilfulness" requirement under the Treaty. Powell offers no evidence that Peart forced her to cooperate or made threats of harm to her if she failed to cooperate. Powell made no effort to report the crime to authorities when she and Peart were stopped at the border. Powell's attempts to avoid the authorities who were holding Peart, and who were looking for her, her feigned attempt to display symptoms of a miscarriage, and her flight from the hospital without being examined by a doctor, additionally show that she was not under duress. Moreover, that she was wearing a gold gown, quite a bit of jewelry, and expensive looking earrings and made no attempt to relinquish those items are additional evidence that Powell was not acting under duress. Finally, Powell's admissions to "Gary" and "Donnie" corroborate her lack of duress or wilfulness. Thus, under *Factor,* the Court applies the interpretation that favors extradition and denies Powell's attempt to apply the duress defense.

But even if facts showing duress were present, affirmative defenses are best left to

the court of jurisdiction. In *Lopez–Smith v. Hood,* 121 F.3d 1322, 1325 (9th Cir.1997), a Magistrate Judge allowed Lopez–Smith to make an offer of proof that he was incompetent. There, a psychologist was allowed to testify and submit a report. Ultimately, however, the Magistrate Judge ruled the evidence irrelevant to the hearing. The Ninth Circuit supported this decision and found no violation of due process.

Lopez-Smith also argued that he was constitutionally entitled to present the equities in his favor because the Treaty with Mexico provides for discretionary, not mandatory extradition. (*Id.* at 1326–1327.) The Ninth Circuit responded that the magistrate judge has no discretion: that is a function of the executive branch. The Court stated that the statute in question mandates that "if the Magistrate 'deems the evidence sufficient to sustain the charge,' then he 'shall' certify that to the Secretary of State." *(Ibid.)* The Court stated that if the Secretary of State wants to exercise his discretion, he should also decide what evidence will have a bearing on his decision. *(Ibid.)*

Consequently, evidence of a duress defense will not obliterate probable cause and is not appropriate for this proceeding. Therefore, this motion is denied.

 Therefore, Powell's attempt to negate "wilful" as part of the dual criminality requirement fails. Dual criminality "exists if the 'essential character' of the acts criminalized by the law of each country are the same and the laws are 'substantially analogous.'" *Oen Yin–Choy v. Robinson,* 858 F.2d 1400, 1405 (9th Cir.1988). Murder, listed in the Treaty's Appendix, is a serious crime in both countries and is punishable by more than a year in prison in each country. Thus, the requirement of dual criminality appears to be met.

The court also recognizes this attack on the dual criminality requirement as a backdoor attempt to introduce evidence of a defense. This motion is denied.

**Powell's Motion for Discovery:**

 Powell requests that the court order discovery of all evidence not already in her possession. Both parties agree that the court has the inherent power to order discovery as "law and justice requires." *Oen–Yin–Choy v. Robinson,* 858 F.2d 1400, 1407 (9th Cir.1988) *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3157, 104 L.Ed.2d 1020 (1989). *Oen–Yin–Choy* goes on to say the court should keep in mind that the extradition hearing is "not to be converted into a dress rehearsal for trial," and "whether the resolution of the contested issue would be appreciably advanced by the requested discovery." *Ibid.* In other words, will the discovery appreciably advance the negation or explanation of the government's showing of probable cause. *Ibid.*

The government asserts Powell has made no showing of how the requested discovery will appreciably advance a contested issue. Indeed, Powell asks for full discovery merely because it "would assist her in explaining the elements in the case against her." (Powell's Motion, p. 18.)

 Powell has made no showing in support of her request. As stated earlier, an extradition proceeding is not a trial. Rebuttal, presentation of contradictory evidence, and examination or cross examination of witnesses are not appropriate in this setting. Powell can make discovery requests at the appropriate time, if extradition is ordered. This motion is DENIED.

### The Government's Motions

**1. Government's Motion to Disallow Powell to Offer Declarations of Two Witnesses.**

Powell offers that she intends to introduce the declarations of Thomas Wayne Powell and Toni Yvonne Savage at the extradition hearing. The government objects, speculating that the declarations will contain contradictory information.

As stated earlier, the court has the discretion to allow evidence. Since the declarations have not yet been submitted to the court, they can not be reviewed for content. Thus, this court will defer a ruling until the extradition hearing.

**2. Government's Motion to Disallow Powell to Incorporate Previous Motions made by Previous Counsel.**

Powell requests that the court incorporate with the present motions the motions filed by her previous counsel, Martha Hall. This court invited the incorporation of those motions when Powell changed counsel from Ms. Hall to her present counsel. Those motions initiated by Ms. Hall in Criminal No. 97–MG–2364, dated November 20, 1997, are accepted by the court and incorporated into this opinion. Those previous motions were reviewed with no change in the court's ruling.

The government's motion is DENIED.